IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

DOUGLAS BAKER,

      Plaintiff,

v.                                                    No. 1:06-cv-01137

WINDSOR REPUBLIC DOORS,

      Defendant.

_____

ORDER GRANTING IN PART, DENYING IN PART DEFENDANT'S
JUDGMENT AS A MATTER OF LAW
_____

The Plaintiff, Douglas Baker, filed this civil action against the Defendant, Windsor Republic

Doors ("WRD"), pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101,

*et seq.*, the Tennessee Handicap Act ("THA"), Tenn. Code Ann. §§ 8-50-103, *et seq.*, and the

Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. §§ 4-21-101, *et seq.*  The Plaintiff

alleged that the Defendant discriminated and retaliated against him and denied him reasonable

accommodation.  At the pretrial stage, this Court denied the Defendant's motion for summary

judgment.[1]  A four-day jury trial began on September 2, 2008, and, at the conclusion of Baker's

proof, the Defendant moved for judgment as a matter of law pursuant to Rule 50(a) of the Federal

Rules of Civil Procedure, which this Court denied.   The jury returned a verdict in favor of the

Plaintiff, awarding him $84,000 in back pay and $29,500 in compensatory damages.  The Defendant

_____

[1]WRD's summary judgment motion and its motion to reconsider the order denying the
dispositive motion were denied by Senior District Judge James Todd on January 3, 2008 and
March 6, 2008, respectively.  (D.E. 44, 51.)

1

timely renewed its motion for judgment as a matter of law and alternatively requested a new trial under Rule 59.  See Fed. R. Civ. P. 50(b).  Upon consideration of the parties' memoranda, the Court GRANTS in part and DENIES in part the Defendant's renewed motion.

FACTUAL BACKGROUND

WRD manufactures hollow steel doors and metal frames.  (Docket Entry ("D.E.") No. 95-97, Trial Transcript, at 55, 144.)  The Plaintiff has worked at WRD's manufacturing plant in McKenzie, Tennessee since July 7, 1985.  (Id. at 144.)  Baker most recently held the position of forklift operator, and his primary duties involved transporting doors from the assembly line to the paint line on a forklift, while traveling through aisles approximately ten to twenty feet wide.  (Id. at 144-45, 230.)  A collective bargaining agreement between WRD and the United Steelworkers of America Local Union 8915 governed the terms of Plaintiff's employment.  (Id. at 114-15.)

Baker suffered from an enlarged heart that caused dilated cardiomyopathy[2] with symptoms of fatigue and shortness of breath.  (Id. at 142.)  In September 2005, he took a leave of absence to have a pacemaker and defibrillator installed so as to curtail rhythm irregularities and prevent heart failure.  (Id. at 57, 142.)  During his leave, he received short-term disability pay for six months, but all pay and benefits ceased after that period.  (Id. at 55, 57-58, 113.)

_____

[2]Dorland's Medical Dictionary defines "cardiomyopathy" as "a general diagnostic term designating primary noninflammatory disease of the heart muscle, often of obscure or unknown etiology and not the result of ischemic, hypertensive, congenital, valvular, or pericardial disease."  The Dictionary defines "dilated cardiomyopathy" as "a syndrome of ventricular dilatation, systolic contractile dysfunction, and, often, congestive heart failure; the course is usually progressive with a poor prognosis.  It is believed to be an expression of myocardial damage caused by a variety of factors, such as alcohol, pregnancy, systemic hypertension, or certain infections."

2

On November 3, 2005, Baker submitted to WRD a medical form, which provided that, beginning January 9, 2006, he could return to work and "resume activities as tolerated." (Id. at 67, 69, 189.) This return-to-work slip listed no restrictions and was supported by a recommendation for work resumption by Dr. Adey Agbetoyin,[3] Baker's cardiologist. (Id. at 188-89.) WRD also received a brochure issued by Medtronic, the medical technology company that manufactured Baker's pacemaker. (Id. at 60.) This brochure, entitled "Electronic Interference and the Work Site," stated in part:

> The majority of work environments will not alter Medtronic implantable device operation[,] [but] some industrial environments or equipment produce high intensity EMI [electromagnetic interference] that may present a potential risk to the implanted device. . . . An evaluation of the work site regarding EMI may be necessary in determining if a patient can resume work. . . . Medtronic Technical Service consultants are available to work with the physician and employer to determine the level of evaluation or testing needed. Some environments can be evaluated through conversations with a Technical Service Consultant and the employer. On occasion, it may be necessary to continue the evaluation by having an environmental consultant perform testing at the worksite[,] [which] should be done by qualified individuals with proper EMI testing equipment . . . . We can provide technical assistance to the environmental consultant or employer in interpreting test results and answering questions regarding EMI and possible device interactions.

(Id. at 60-63; see also Exhibit 1, Medtronic Brochure.) This document laid out EMI thresholds for the pacemaker at 5Gs.[4] (Id. at 139-40.) It also stated that extremely high intensity fields could disrupt the operation of the pacemaker. (Id.)

Larry Land, WRD's director of human services, conducted what he referred to as the "accommodation review process" with regard to Baker. (D.E. 95, Trial Transcript, at 55, 58, 106-

---

[3]Dr. Agbetoyin had no formal training in engineering or EMI testing. (D.E. 95, Trial Transcript, at 73.)

[4]Gauss, abbreviated "G", is a unit of measurement for electromagnetic fields.

07.)  Land explained this as a process whereby all employees returning from medical leave had their restrictions evaluated, and WRD then determined whether the restrictions could be accommodated in the workplace.  (Id.)  After reviewing Baker's return-to-work slip, Land was concerned by some of the language in Medtronic's pacemaker brochure.  (Id. at 58, 63-64.)  However, neither Land nor any other WRD employee ever called Medtronic's technical service consultants for assistance or had an environmental test conducted by a qualified EMI expert in the workplace.  (Id. 64-66.)  Land spoke with Jason Lowery, an engineer working at WRD, but he was not qualified to determine whether the EMI at the facility might affect Baker's pacemaker.  (Id. at 138-39.)  Lowery did, however, compile a list of the voltages of the various electrical devices around the plant.  (Id. at 81, 137-38.)

On January 4, 2006, Land sent a letter to Dr. Agbetoyin stating, "Unfortunately we cannot allow Mr. Baker to return to work until we hear from you as to whether or not his return to work would cause him physical harm," and inquired as to whether Baker's condition necessitated restrictions.  (Id. at 69-70, 73-75; see also Exhibit 3, Land Letter.)  The letter listed potential sources of EMI in the plant, including a paint booth, resistance welders, fluorescent lights, high bay lighting, and microwave ovens, along with their respective voltage measurements.  (D.E. 95, Trial Transcript, at 73-75, 81.)  Land was concerned that these devices might affect Baker's pacemaker and perhaps cause him injury from "the slightest physical harm to death."  (Id. at 72-73.)  Land also sent Dr. Agbetoyin literature describing the Meditronic pacemaker, and inquired of the physician as to whether WRD's manufacturing plant might create unique risks for Baker due to the presence of electronic equipment.  (Id. at 123.)  On March 1, 2006, Land sent another letter to Dr. Agbetoyin, requesting more information about the pacemaker and stating that "[m]ost of the other jobs available

[at the plant] require more physical exertion than [Baker's] current job and all other jobs in the location will have some exposure to the electrical sources referenced above." (Id. at 79-82, 189-90; see also Exhibit 4, Land Letter.)

In response to Land's letters, on March 30, 2006, Dr. Agbetoyin replied by recommending that Baker return to work with restrictions, which included avoiding "contact with any electrical current or magnetic fields."[5] (Id. at 89, 219; see also Exhibit 5, Agbetoyin Letter.) Dr. Agbetoyin also noted that the labor union, of which Baker was a member, had worked out a route where he could operate his forklift in order to avoid dangerous magnetic fields. (Exhibit 5, Agbetoyin Letter.) Though not mentioned in his letter to Land, Dr. Agbetoyin later clarified that he thought Baker could also benefit from using an electromagnetic frequency alarm ("EMF alarm"), which is a device that emits an audible warning when one is in proximity to EMI.[6] (D.E. 95, Trial Transcript, at 84.) In his video deposition, Dr. Agbetoyin explained by saying:

> In my medical opinion, I felt that [Baker] should be able to – to return to work as long as he was wearing an EMF alarm, which I feel should alarm in the presence of high electromagnetic fields. In addition . . . we were going to keep monitoring the device and would do . . . follow-up visits to determine if there was any effect or malfunction from his daily activities.

(D.E. 76, Agbetoyin Depo, at 19.) On April 13, 2006, Land sent Dr. Agbetoyin a third letter that noted Baker's duties involved frequent exposure to EMI and provided a map illustrating Baker's driving route and locations where EMI had been detected in its facility. (D.E. 95, Trial Transcript, at 84-88; see also Exhibit 6, Land Letter.) Land requested that Dr. Agbetoyin personally visit its

---

[5]The doctor's letter also stated that Baker should refrain from lifting over 40 or 50 pounds. (D.E. 95, Trial Transcript, at 129.)

[6]According to Baker, the idea of using an EMF alarm initially came from his union steward. (D.E. 95, Trial Transcript, at 147.)

manufacturing site, but received no response from the doctor regarding that invitation. (Exhibit 6, Land Letter.)

WRD later purchased an EMF alarm and instructed one of its employees to walk through the areas where Baker's job routinely required him to travel. (D.E. 95, Trial Transcript, at 89-90, 100, 131.) Additionally, the Plaintiff's labor union attempted to design a route in which Baker could operate the forklift while avoiding magnetic fields, though apparently this "safe route" was never completed. (<u>Id.</u> at 127, 129-30.) On June 6, 2006, Land contacted Baker–over the phone and by letter–and told him that he did not consider the EMF alarm a "reasonable accommodation" because he believed Baker would have difficulty hearing or seeing the alarm over the noise pollution in the facility. (<u>Id.</u> at 95; Exhibit 7, Land Letter.) However, Land's letter also stated that "[t]he company believe[d] that it [had] found a solution to the issue and the purpose of this letter [was] to set forth the company's action to this point in the process and [Baker's] alternatives in moving forward." (D.E. 95, Trial Transcript, at 100, 112-13; Exhibit 7, Land Letter.) The "solution" offered was for Baker to waive his rights to workers' compensation benefits arising from injury caused by heart disease, heart attack, or coronary failure or occlusion. (D.E. 95, Trial Transcript, at 96, 98, 101.) Land indicated that further delay would result if Baker declined to waive his workers' compensation rights because the company would be in "the state of unknown whether or not [returning to work] would cause him physical harm." (<u>Id.</u> at 102-03.) Baker did not agree to the workers' compensation waiver because he was worried that, if he suffered a heart-related injury at work, he would have no statutory benefits and no insurance coverage. (<u>Id.</u> at 148.)

As of the trial, WRD had not given Baker the option of returning to work without waiving his rights under Tennessee's workers' compensation laws. (<u>Id.</u> at 104.) Baker has indicated to

WRD that he wishes to return to work, with or without the EMF alarm, though he refuses to do so without workers' compensation coverage. (Id. at 152; see also Exhibit 12, Baker Letter.) Since June 2006, Baker claims he has inquired into about fifty different positions in several surrounding counties but has yet to obtain new employment. (D.E. 95, Trial Transcript, at 154-55.) During this period of unemployment, he has sold some personal items and borrowed money from his father, friends, and three different banks in order to avoid foreclosure on his home. (Id. at 155-56.) Baker said that his financial situation has forced him to tears on occasion, damaged his relationship with his son and the rest of his family, and made him feel "like a burden and a bum to everybody." (Id. at 156-57.)

Prior to trial, WRD instructed its employee, Jack Fields, to inspect its plant with a gauss meter.[7] (Id. at 326.) Fields recorded sixteen areas where the meter registered greater than 5 Gs. (Id. at 327.) At one point, the meter registered 200 Gs at the edge of an aisle where Baker's forklift would routinely pass, and Fields found other exceptionally high readings around the break room and bathroom. (Id. at 327-29.)

At the conclusion of the trial, the jury returned a verdict finding that the Plaintiff had been regarded as disabled, was a qualified individual, was not provided reasonable accommodation under the ADA or THA, and had suffered retaliation. (D.E. 85, Jury Verdict.) The jury awarded him $84,000 in back pay and $29,500 in compensatory damages. (Id.) The Court entered a judgment against the Defendant in the amount of $113,500, pursuant to the jury's verdict, and ordered WRD

---

[7]A gauss meter, also known as an EMF meter, is an instrument that detects and measures electromagnetic fields.

to reinstate the Plaintiff with reasonable accommodations.[8]

## STANDARD OF REVIEW

Rule 50 of the Federal Rules of Civil Procedure provides that a court may grant judgment against a party who has been fully heard on an issue during a jury trial if the court "finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). When reviewing a motion under Rule 50 where jurisdiction is based on a federal statute, "the evidence should be viewed in the light most favorable to the party against whom the motion is made, and that party given the benefit of all reasonable inferences." K & T Enter., Inc. v. Zurich Ins. Co., 97 F.3d 171, 175-76 (6th Cir. 1996). The Court will grant the Defendant's motion "only if reasonable minds could not come to a conclusion other than one favoring the movant." Id. (citing Wehr v. Ryan's Family Steak Houses, Inc., 49 F.3d 1150, 1152 (6th Cir. 1995); Phelps v. Yale Sec., Inc., 986 F.2d 1020, 1023 (6th Cir. 1993)). This means that the Court will not weigh the evidence, question the credibility of witnesses, or substitute its judgment for that of the jury. Black v. Zaring Homes, 104 F.3d 822, 825 (6th Cir. 1997).

## ANALYSIS

I.      "Regarded As" Disabled

The ADA prohibits covered entities from discriminating against "a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the

---

[8]The court subsequently ordered a stay of the portion of its Judgement reinstating Baker, pending resolution of all post-trial motions and appeals. (D.E. 116.)

hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."[9]   42 U.S.C. § 12112(a).  Further, the ADA requires employers to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A).  The prima facie case of the Plaintiff's claim for disability discrimination requires proof of the following: "(1) [that] he has a disability; (2) that he is 'otherwise qualified' for the job; and (3) that defendant[] . . . refused to make a reasonable accommodation for his disability . . . ." Smith v. Ameritech, 129 F.3d 857, 866 (6th Cir. 1997) (citing Roush v. Weastec, Inc., 96 F.3d 840, 843 (6th Cir. 1996)).

The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(2).  Whether a plaintiff has a disability as defined by the ADA is an individualized inquiry.  Sutton v. United Airlines. Inc., 527 U.S. 471, 483, 119 S. Ct. 2139, 144 L. Ed. 2d 450 (1999).  A plaintiff must "offer evidence that the extent of the limitation caused by [his] impairment in terms of [his] own experience is substantial," Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 185, 122 S. Ct. 681, 151 L. Ed. 2d 615 (2002), or perceived to be substantial by the employer, Ross v. Campbell Soup Co., 237 F.3d 701, 706 (6th Cir. 2001).  The United States Supreme Court has instructed that the standard for qualifying as "disabled" under the ADA is a demanding one to be interpreted strictly.  Toyota Motor Mfg., 534 U.S. at 197.

---

[9]The Tennessee courts look to the ADA for guidance when considering whether a plaintiff has a "handicap" for the purpose of a THRA and THA claim.  See Dunn v. Sharp Mfg. Co. of Am., No. 01-2679 Ma/V, 2003 U.S. Dist. LEXIS 6454, 2003 WL 1793038, at *3 (W.D. Tenn. Jan. 10, 2003) (citing Barnes v. Goodyear Tire & Rubber Co., 48 S.W.3d 698, 706 (Tenn. 2000)).

In this case, Baker argues that WRD regarded him as disabled, which would qualify him for disability status under subsection (C). 42 U.S.C. § 12102(2)(C). The Supreme Court has noted two instances where this subsection applies: "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." Sutton, 527 U.S. at 489. Both involve scenarios where an employer entertains misperceptions about an employee's condition. Id. In the first instance, the employer believes that the employee "has a substantially limiting impairment that he does not have," and, in the second, the employer believes that the employee "has a substantially limiting impairment when, in fact, the impairment is not so limiting." Id. In either case, the employer's mistake is often the result of "stereotypic assumptions not truly indicative of . . . individual ability." Id. (citing 42 U.S.C. § 12101(7)). Similarly, the EEOC has laid out three regarded-as-disabled scenarios, which involve demonstration that the employee

> (1) Has a physical or mental impairment that does not substantially limit major life activities but is treated by a covered entity as constituting such limitation;

> (2) Has a physical or mental impairment that does substantially limit major life activities only as a result of the attitudes of others toward the impairment; or

> (3) Has [no impairment] but is treated by a covered entity as having a substantially limiting impairment.

29 C.F.R. § 1630.2(l);[10] see also Burrell v. Cummins Great Plains, Inc., 324 F. Supp. 2d 1000, 1016

---

[10]The United State Supreme Court has observed that courts might look to the Equal Employment Opportunity Commission's regulations for guidance in interpreting the ADA:
> There are two potential sources of guidance for interpreting the terms of this definition [of disability]–the regulations interpreting the Rehabilitation Act of 1973 . . . and the EEOC regulations interpreting the ADA. . . . The persuasive authority of the EEOC regulations is less clear. As we have previously noted, no agency has

(S.D. Iowa 2004).  In determining if any of the above situations apply, the trier of fact considers "the state of mind of the employer against whom [the plaintiff] makes a claim."  Ross, 237 F.3d at 706. "It is not enough . . . that the employer regarded that individual as somehow disabled; rather, the plaintiff must show that the employer regarded the individual as disabled within the meaning of the ADA," Id. at 709 (quoting Colwell v. Suffold County Police Dept., 158 F.3d 635, 646 (2d Cir. 1998)), which means the employer must have regarded the individual as having "a physical or mental impairment that substantially limits one or more of the major life activities."  42 U.S.C. § 12102(2)(A).  In determining whether a person is "substantially limited," the United States Supreme Court has instructed courts to consider both the positive and negative effects of corrective measures.[11]  Sutton, 527 U.S. at 482.

The EEOC advises that "major life activities" include "caring for oneself, performing manual

----

been given authority to issue regulations interpreting the term "disability" in the ADA.  Nonetheless, the EEOC has done so. Toyota Motor Mfg., 534 U.S. at 193-94 (internal citations omitted); see also Sutton, 527 U.S. at 479. While the Supreme Court has had "no occasion to consider what deference [the EEOC regulations] are due," Sutton, 527 U.S. at 480, courts within the Sixth Circuit have referred to the EEOC's interpretations of the ADA on several occasions.  See, e.g., Linser v. Ohio Dep't of Mental Health, No. 99-3887, 2000 WL 1529809, 2000 U.S. App. LEXIS 25644, at *12 (6th Cir. Oct. 6, 2000); Gibson v. Wal-Mart Stores, Inc., No. 98-5102, 1999 WL 503459, 1999 U.S. App. LEXIS 15180, at *6-7 (6th Cir. July 6, 1999); Bryant v. Delbar Prods., Inc., 18 F. Supp. 2d 799, 804 (M.D. Tenn. 1998).

[11]As the Sixth Circuit has noted, recent amendments to the ADA will overturn the Supreme Court's instruction to consider measures taken to correct an impairment, but these amendments did not become effective until January 2009 and do not apply retroactively. Verhoff v. Time Warner Cable, Inc., 299 Fed. App'x, 488, 492 n.3 (6th Cir. Oct. 24, 2008); Amendments Act of 2008, Pub. L. No. 110-325, § 3(4)(E)(i), 122 Stat. 3553 (2008) (effective Jan. 1, 2009) ("The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures[.]"); see also Kravar v. Triangle Servs., Inc., No. 1:06-cv-07858-RJH-FM, 2009 WL 805807, 2009 U.S. Dist. LEXIS 26459, at *11-12 (S.D.N.Y. Mar. 30, 2009).

tasks, walking, seeing, hearing, speaking, breathing, learning, and working."  29 C.F.R. § 1630.2.

In this case, the jury found that the Defendant regarded the Plaintiff as substantially limited in the

major life activity of "working."  (D.E. 86, Jury Instructions, at 21.)  The Supreme Court has said

that, when the substantially limited major life activity is working, the ADA "requires, at a minimum,

that plaintiffs allege they are unable to work in a broad class of jobs."  Sutton, 527 U.S. at 491.  In

this context, "substantially limits" means

> significantly restricted in the ability to perform either a class of jobs or a broad range
> of jobs in various classes as compared to the average person having comparable
> training, skills and abilities.  The inability to perform a single, particular job does not
> constitute a substantial limitation in the major life activity of working.

Id. (quoting 29 C.F.R. § 1630.2(j)(3)(i)); see also Swanson v. Univ. of Cincinnati, 268 F.3d 307, 317

(6th Cir. 2001).  The Supreme Court further explained:

> To be substantially limited in the major life activity of working, then, one must be
> precluded from more than one type of job, a specialized job, or a particular job of
> choice.  If jobs utilizing an individual's skills (but perhaps not his or her unique
> talents) are available, one is not precluded from a substantial class of jobs.  Similarly,
> if a host of different types of jobs are available, one is not precluded from a broad
> range of jobs.

Sutton, 527 U.S. at 492.  Factors to consider when determining whether a plaintiff is substantially

limited in the major life activity of working include the following:

> (A) The geographical area to which the individual has reasonable access;
>
> (B) The job from which the individual has been disqualified because of an
> impairment, and the number and types of jobs utilizing similar training, knowledge,
> skills or abilities, within that geographical area, from which the individual is also
> disqualified because of the impairment (class of jobs); and/or
>
> (C) The job from which the individual has been disqualified because of an
> impairment, and the number and types of other jobs not utilizing similar training,
> knowledge, skills or abilities, within that geographical area, from which the
> individual is also disqualified because of the impairment (broad range of jobs in
> various classes).

29 C.F.R. § 1630.2(j)(3)(ii).[12]   The Supreme Court has recognized the "conceptual difficulty in defining 'major life activities' to include work, for it seems 'to argue in a circle to say that if one is excluded, for instance, by reason of [an impairment, from working with others] . . . then that exclusion constitutes an impairment, when the question you're asking is, whether the exclusion itself is by reason of handicap.'"[13]   Sutton, 527 U.S. at 492 (quoting Tr. of Oral Arg. in School Bd. of Nassau Co. v. Arline, 481 U.S. 1024, 95 L. Ed. 2d 519, 107 S. Ct. 1913, O. T. 1986, p. 15 (argument of Solicitor General)) (alterations in original).   Likewise, the Sixth Circuit has commented that when a plaintiff attempts to show that an employer regarded him as unable to perform a broad range of jobs, "proving the case becomes extraordinarily difficult," and it "takes a plaintiff to the farthest reaches of the ADA."   Ross, 237 F.3d at 709.   "As it is safe to assume employers do not regularly consider the panoply of other jobs their employees could perform, and certainly do not often create direct evidence of such considerations, the plaintiff's task becomes even more difficult."   Id. Although, the ultimate question depends "almost entirely in the employer's subjective state of mind," and a plaintiff must present enough evidence to show a genuine issue of fact as to the

---

[12]As with all other limitations on life activities, a court should also consider "the nature and severity of the impairment; the duration or expected duration of the impairment; and the permanent or long-term impact, or the expected permanent or long-term impact of or resulting from the impairment."   Toyota Motor Mfg., 534 U.S. at 195 (quoting 29 C.F.R. §§ 1630.2(j)(2)(i)-(iii)).

[13]The Supreme Court has yet to fully endorse these interpretations of the ADA as controlling law.   See Sutton, 527 U.S. at 492-93 (stating that because the parties do not dispute it, the Court will assume "without deciding that working is a major life activity and that the EEOC regulations interpreting the term 'substantially limits' are reasonable").   Nonetheless, the Sixth Circuit has recognized that this can provide a basis for disability.   Ross, 237 F.3d at 709 (stating that "the drafters of the ADA and its subsequent interpretive regulations clearly intended that plaintiffs who are mistakenly regarded as being unable to work have a cause of action under the statute").

employer's thought process prior to the adverse employment action.  Id.

At trial, the Plaintiff presented evidence that Land considered him to be unfit to work in the vicinity of common EMI-producing electronic devices, such as fluorescent lights, paint booths, microwave ovens, and high bay lighting.  (D.E. 95, Trial Transcript, at 73-75, 81.)  Also, Land testified that, though he was unsure as to the intensity threshold, he was concerned that anything ranging from "the slightest physical harm to death" could befall Baker upon exposure to EMI.  (Id. at 71-73.)  Land further indicated that he thought Baker's limitation went beyond the single position of forklift operator.  (Id. at 75-77.)  In fact, Land stated that he was not sure whether Baker, due to his condition, was capable of performing any one of forty classifications of jobs at WRD's manufacturing facility.  (Id. at 76.)  A reasonable inference form this evidence is that Land perceived Baker as incapable of working a substantial range of manufacturing jobs.  As such, a reasonable juror could have found that Land regarded Baker as unable to perform a "broad class of jobs," which is sufficient to provide the basis for the jury's finding of disability.  Sutton, 527 U.S. at 491.

II.      Reasonable Accommodation

The Defendant argues that the Sixth Circuit has interpreted the ADA in such a way that an employee cannot be both "regarded as" disabled and entitled to reasonable accommodation.  The Defendant first notes that the Plaintiff's only theory of disability at trial was that WRD regarded him as disabled.  (D.E. 89, Def.'s Mot. for JMOL, at 2; D.E. 86, Jury Instructions, at 13 ("Plaintiff admits that he is not disabled as defined under these statutes.  Rather, he alleges that defendant regarded him as being disabled, because he had a pacemaker implanted in him in 2005.").)  It also avers that failure to provide reasonable accommodation was an essential component of the Plaintiff's discrimination claim.  (D.E. 85, Jury Verdict.)  Citing to Gruener v. Ohio Cas. Ins. Co., 510 F.3d

661, 665 (6th Cir. 2008) and <u>Workman v. Frito-Lay, Inc.</u>, 165 F.3d 460, 467 (6th Cir. 1999), WRD then argues that because an employee who is only "regarded as" disabled is not entitled reasonable accommodation, the jury's verdict with regard to the Plaintiff's discrimination claim should be reversed.  (D.E. 89, Def.'s Mot. for Judgment as a Matter of Law, at 2.)  The Plaintiff naturally disputes this legal proposition and argues that the Defendant has misinterpreted <u>Gruener</u> and <u>Workman</u> by carving out dicta.  (D.E. 101, Pl.'s Resp., at 12.)

Considering that deciphering the holdings of the cases cited by the Defendant is key to resolving this dispute, examining their contexts is vital.  In <u>Gruener</u>, the employee had a double knee replacement, which restricted her ability to squat, crawl, or kneel.  510 F.3d at 663.  Following her surgery, Plaintiff's employer reassigned her as a PC Services Technician, a position that required "extensive physical exertion." <u>Id.</u>  Gruener's supervisors then uncovered medical restrictions in her personnel file.  <u>Id.</u>  Because of these restrictions, her employer determined that she could not perform the essential functions of a PC Services Technician without assistance and terminated her. <u>Id.</u>  Gruener filed suit for disability discrimination.  After presentation of proof, the trial court declined to instruct the jury on "regarded as" disability because the plaintiff had only offered evidence of <u>actual</u> inability to perform manual tasks.  <u>Id.</u> at 664-65.  The Sixth Circuit panel upheld the trial court's ruling because the proof showed that the employer's perception mirrored the "restrictions prescribed by her own doctor," which meant Gruener had not established that her employer "entertained misperceptions" about her condition.  <u>Id.</u> at 665 (quoting <u>Sutton</u>, 527 U.S. at 489).

The basic holding of <u>Gruener</u> was that a jury charge for "regarded as" disability is inappropriate when the plaintiff presents no evidence tending to prove that the employer was

15

mistaken about the employee's limitations.  Id.; see also Sutton, 527 U.S. at 489.  That ruling is inapplicable to the facts of this case, however, because Baker presented proof from which a reasonable juror could find that WRD mistakenly perceived him as having limitations that exceeded the restrictions placed upon him by his doctor.  See supra at section I.  For example, Dr. Agbetoyin approved Baker's release to work with an EMF alarm, but Defendant would not permit him to return under these prescribed conditions until he waived his workers' compensation rights.  (D.E. 76, Agbetoyin Depo, at 19; D.E. 95, Trial Transcript, at 84, 104.)  Contrary to the Defendant's assertion, the Gruener court did not explicitly state that a plaintiff who proves "regarded as" disability cannot, under any circumstances, bring a claim for failure to reasonably accommodate.[14]  Divining such a rule from Gruener would misinterpret and extend the scope of the holding, especially considering that the plaintiff in that case, unlike here, had presented no evidence to establish "regarded as" disability.

The Defendant's citation to Workman is more relevant.  Workman was fired from her job

---

[14]The Defendant focuses on the following language from Gruener: "The ADA's regarded-as-disabled . . . provision protects employees who are 'perfectly able' to perform a job, but are 'rejected . . . because of the myths, fears and stereotypes associated with disabilities.'" 510 F.3d at 664 (quoting Ross, 237 F.3d at 706; Sutton, 527 U.S. at 489-90).  The Defendant insinuates that the phrase "perfectly able" implies without accommodation.  (D.E. 89, Def.'s Mot. for Judgment as a Matter of Law, at 2.)  However, the Defendant misinterprets the usage of the word "perfectly."  The Defendant implies that the Gruener court used "perfectly" to mean "in a perfect manner" or "without fault."  Webster's New College Dictionary, 873 (9th ed.1985).  To the contrary, the context in which the word was utilized indicates that the intended meaning was "to a complete or adequate extent: quite."  Webster's New College Dictionary, 873 (9th ed.1985).  The Gruener court took the phrase "perfectly able" from Ross v. Campbell Soup Co., 237 F.3d 701, 706 (6th Cir. 2001), in which the full sentence stated that "an individual may fall into the definition of one regarded as having a disability if an employer ascribes to that individual an inability to perform the functions of a job because of a medical condition when, in fact, the individual is perfectly able to meet the job's duties."  The Ross court did not say "perfectly able to meet the job's duties" without accommodation, and the Gruener decision, likewise, did not infer that conclusion from the Ross quotation.  Id.

16

as an assembly line worker because her irritable bowel syndrome forced her to take several trips to the restroom during working hours.  Workman, 165 F.3d at 463-64.  Prior to her termination, she "suggested a number of accommodations, all of which were rejected" by her employer.  Id. at 464. She brought a discrimination claim under both "regarded as" and actual disability theories.  Id at 646-65. The jury returned a general verdict in her favor, which meant that the jury form did not specifically indicate which prong of "disability" it found applied.  Id.  The court of appeals held that a reasonable jury could have found Workman to have had either an actual disability or a "regarded as" disability.  Id. at 467.  In discussing "regarded as" disability, the court wrote the following:

> [T]he defendant correctly contends that a finding on this basis would obviate the Company's obligation to reasonably accommodate Workman.  See 29 C.F.R. § 1630.2(1)(1)-(3);[15]  First Br. of Defendant-Appellant at A-3 (EEOC Training Manual).  However, Workman was fired.  If Frito-Lay regarded her as disabled and would not reinstate her despite the fact that she did not need an accommodation, they would be liable for discrimination under the ADA.  If the jury credited Workman's testimony at trial, and the testimony of some Frito-Lay employees that temporarily replacing people on the line was regularly done (i.e., not a special accommodation), then they could have found for Workman under this prong.  Undoubtedly, there is evidence in the record to contradict this version of events (as there is to contradict other versions of events), but the question is whether a jury would be unreasonable to find for Workman under this prong.  We conclude that it would not.

Id. (emphasis and footnote added).

The Defendant argues that the first quoted sentence in this portion of the opinion establishes a rule that reasonable accommodation is not required for "regarded as" disabilities, but the Plaintiff

---

[15]The Workman opinion does not analyze or explain the relevance of 29 C.F.R. § 1630.2(1)(1)-(3) to the proposition for which it is cited.  This regulation, which is quoted supra in section I of this opinion, provides examples of situations in which a plaintiff may be "regarded as" disabled, but it never mentions "reasonable accommodation" either implicitly or explicitly. Based on a plain reading, it is not apparent how this regulation would support the proposition that reasonable accommodation is not available to an employee who is regarded as disabled.

contends that it constitutes dictum.  Black's Law Dictionary defines "dicta"[16] as the following:

> Opinions of a judge which do not embody the resolution or determination of the specific case before the court.  Expressions in [a] court's opinion which go beyond the facts before [the] court and therefore are [the] individual views of [the] author of [the] opinion and not binding in subsequent cases as legal precedent.

Black's Law Dictionary 454 (6th ed. 1990); see also United States v. Miller, __ F. Supp. 2d __, No. 08-cr-10097, 2009 WL 499111, 2009 U.S. Dist. LEXIS 15080, at *5-10 (W.D. Tenn Feb. 26, 2009) (discussing how lower courts apply dicta).  When considering the arguments made by the parties and the legal issues presented in Workman, this Court cannot agree that the clear statement by the Sixth Circuit–that a finding of "regarded as" disability obviates the obligation to reasonably accommodate–qualifies as dictum.  One of Workman's arguments at trial was that her employer regarded her as disabled, she proposed "a number of accommodations," and the employer's failure to implement these accommodations gave rise to a discrimination claim.[17]  Workman, 165 F.3d at 464.  In considering whether a reasonable jury could find liability on this basis, the Sixth Circuit stated that finding a "regarded as" disability "would obviate the Company's obligation to reasonably accommodate."  Id. at 467.  This statement does not "go beyond the facts" in this case because whether the employer was required to provide "special accommodation" to an employee it regarded as disabled would have established one basis on which the general verdict in favor of Workman could have been affirmed.  As such, this legal question fell within the scope of the controversy

---

[16]"Dictum," the singular of "dicta," is an abbreviated form of "obiter dictum," which is a Latin phrase often translated as "a remark by the way."  Black's Law Dictionary 454 (6th ed. 1990).

[17]Further, after the jury verdict, the trial court ordered the defendant "to make reasonable accommodations for her irritable bowel syndrome condition without requiring her to defecate in her undergarment or utilize a sanitary device such as an adult diaper."  Workman, 165 F.3d at 465.

before the Sixth Circuit panel and should not be considered a mere "by the way" remark of the individual author.  Ultimately, the <u>Workman</u> court found that the verdict should be upheld on an alternative ground–namely that the plaintiff was denied regular accommodation because of her "regarded as" disability–but that does not render the court's previous statement of law irrelevant to the legal issues presented or non-binding.  <u>Id.</u>  Indeed, other courts have cited to <u>Workman</u> for the proposition that the Sixth Circuit falls in the category of circuits that find disharmony between reasonable accommodation and "regarded as" disability.  <u>See</u> <u>Kelly v. Metallics W., Inc.</u>, 410 F.3d 670, 675 (10th Cir. 2005); <u>D'Angelo v. Conagra Foods</u>, 422 F.3d 1220, 1235 (11th Cir. 2005).

While the Plaintiff may disagree with the legal basis of the <u>Workman</u> court's interpretation of the ADA,[18] it cannot be dismissed as dictum and, therefore, constitutes binding precedent for this

---

[18]Other circuits have reached the opposite conclusion, noting that the ADA makes no express distinction between "regarded as" and actual disability with regard to accommodation. <u>Compare</u> 42 U.S.C. § 12112(a) (prohibiting discrimination against "a qualified individual with a disability because of the disability of such individual"); <u>with</u> 42 U.S.C. § 12102(2)(A), (C) (stating that the general term "disability" includes individuals "regarded as" having "a physical or mental impairment that substantially limits one or more of the major life activities of such individual"); <u>see also</u> <u>Kelly</u>, 410 F.3d at 675 (stating that the ADA's statutory definitions encompass "individuals (1) regarded as disabled but (2) who, with reasonable accommodation, can perform the essential functions of the position that they hold"); <u>D'Angelo</u>, 422 F.3d at 1235 (stating that because "the ADA's plain language–which treats an individual who is disabled in the actual-impairment sense identically to an individual who is disabled in the regarded-as sense–compels us to conclude that the very terms of the statute require employers to provide reasonable accommodations for individuals it regards as disabled"); <u>Williams v. Philadelphia Hous. Auth. Police Dep't</u>, 380 F.3d 751, 763, 766 (3d Cir. 2004) (holding that a reasonable juror could find "regarded as" disability where a police officer had an "actual limitation" of "his inability to carry a firearm resulting from his severe depression," which may not qualify as a substantial limitation, but allegedly his employer mistakenly perceived him as "being unable to have access to firearms and to be around others carrying firearms"); <u>McKenzie v. Dovala</u>, 242 F.3d 967, 975 (10th Cir. 2001) (holding that an employee with a "regarded as" disability had made a prima facie case of discrimination based on her employer's alleged failure to reasonably accommodate her perceived disability); <u>contra</u> <u>Kaplan v. City of N. Las Vegas</u>, 323 F.3d 1226, 1232 (9th Cir. 2003) (holding "that 'regarded as' disabled plaintiffs are not entitled to reasonable accommodations") (citing <u>Weber v. Strippit, Inc.</u>, 186 F.3d 907, 916-17 (8th Cir. 1999)).

Court.  Because the present rule in the Sixth Circuit is that an employer is not obligated to specially accommodate a "regarded as" disabled employee, WRD cannot be liable for having failed to provide such accommodations, as the jury found.

The Plaintiff argues in the alternative that, even absent an affirmative duty to provide special accommodation, an employer must allow for regular accommodations if it normally does so as part of its usual business practice.  Workman draws a distinction between regular accommodations, which are routinely made for all employees, and special accommodations, which are exceptionally made to allow a person with a disability under the ADA to perform the essential functions of a job. As the Supreme Court has noted, "any special 'accommodation' requires the employer to treat an employee with a disability differently, i.e., preferentially."  US Airways, Inc. v. Barnett, 535 U.S. 391, 397-98, 122 S. Ct. 1516, 152 L. Ed. 2d 589 (2002).  In contrast, an employee requesting accommodation uniformly available to all employees, such as bathroom breaks, may be found not to require preferential treatment and is entitled to be treated on equal footing with his peers. Workman, 165 F.3d at 467.  In Workman, the court held that "[i]f the jury credited Workman's testimony at trial, and the testimony of some Frito-Lay employees that temporarily replacing people on the line was regularly done (i.e., not a special accommodation), then they could have found for Workman under this prong."  Id.  In other words, a reasonable jury could have found that the employer normally would allow temporary bathroom breaks, and Workman's condition only required her to take routine breaks.  Id.  Thus, the employer's failure to give Workman the benefit of accommodations regularly made for non-disabled employees constituted discrimination as a result of her "regarded as" disability because she was terminated "despite the fact that she did not need an accommodation."  Id.

20

In this case, the Plaintiff argues that allowing him to use an EMF alarm would have been a regular accommodation and consistent with WRD's normal business practice. He points to Lane's testimony at trial that WRD routinely performed an "accommodation review process" in order to determine whether a returning employee had medical restrictions that could be accommodated. (D.E. 95, Trial Transcript, at 55, 58, 106-07.) The Plaintiff asserts that this evidence establishes a regular practice whereby WRD employees generally receive accommodations for all medical restrictions, which necessarily includes accommodations for an EMF alarm. He also notes that the Defendant made some efforts to provide him with an EMF alarm. He argues that an employer cannot regularly honor medical restrictions of other employees but deny similar treatment to employees whom it regards as disabled.

Despite the Plaintiff's argument, the Court finds that the proof presented at trial was insufficient for a jury to determine that WRD had a regular business practice of providing the specific accommodations that Baker requested. Though WRD may have had a general policy of attempting to accommodate restrictions, the Plaintiff has presented no evidence that WRD previously allowed other employees to utilize an EMF alarm, in particular, to accommodate a pacemaker. In Workman, the court upheld liability on the part of the employer because the plaintiff specifically showed that her employer routinely allowed for temporary substitutions on the line, but she had been terminated despite the fact that her medical condition could have been compensated through regular substitutions. Workman, 165 F.3d at 463-64. Nothing in that opinion suggests that an employer's general policy of attempting to accommodate medical restrictions is sufficient to

establish a regular business practice of accommodating all medical conditions.[19]  Additionally, the

fact that WRD made some efforts to allow Baker to work with an EMF alarm is insufficient, in itself,

to show this was a regular practice.  Because Baker presented no evidence that established WRD

previously permitted use of EMF alarms or other similar accommodations he had requested, the

proof at trial was insufficient for a reasonable jury to find that the Defendant discriminated against

him by denying him regular accommodations.[20]  See Fed. R. Civ. P. 50(a)(1).  As this was a

necessary component of the Plaintiff's discrimination theory, the Court grants the Defendant's

motion for judgment as a matter of law as to this claim.

   III.   Retaliation

   The portion of the ADA dealing with retaliation provides:

> No person shall discriminate against any individual because such individual has
> opposed any act or practice made unlawful by this chapter or because such individual
> made a charge, testified, assisted, or participated in any manner in an investigation,
> proceeding or hearing under this chapter.

42 U.S.C. § 12203(a).[21]  The Court applies the McDonnell Douglas burden-shifting approach to a

---

[19]Such a holding could potentially expose employers to a wide-range of liability for adopting procedures for dealing with any non-disabling medical conditions, and it may have the negative effect of discouraging employers from implementing accommodation review programs–an outcome that would be contrary to the underlying policy goals of the ADA.  See 42 U.S.C. § 12101.

[20]The Plaintiff also makes the following argument:
under analogous estoppel law, Defendant cannot, on the one hand, seek to accommodate Plaintiff through the solution of an EMF alarm . . . , including encouraging him to get an EMF alarm and have his physician come to the plant, but then deny his eligibility for that very accommodation once at trial.
(D.E. 101, Plaintiff's Response, at 14.)  The Plaintiff cites to no source of law that would support this estoppel argument in an ADA case, and the Court finds no legal basis for this contention.

[21]The Plaintiff also raised a state claim for retaliation under the THA, which is instructed by federal law.  Dunn, 2003 WL 1793038, at *3 (citing Barnes, 48 S.W.3d at 706).

claim for retaliation under the ADA.  Bryson v. Regis Corp., 498 F.3d 561, 577 (6th Cir. 2007).

This means the Plaintiff must establish a prima facie case of retaliation, which requires him to show

that "(1) [he] engaged in a protected activity; (2) [he] suffered an adverse employment action; and

(3) there is a causal link between the protected activity and the adverse employment action."[22]  Id.

The Court initially must determine whether the Plaintiff presented sufficient evidence for the

jury to find that he engaged in a protected activity, considering that the Sixth Circuit does not require

employers to specially accommodate "regarded as" disabled employees.  See supra at II.  Baker

argues that, pursuant to the ADA retaliation provisions, employees who have made a good faith

request for reasonable accommodation can be considered to have engaged in a protected activity.

After reviewing the applicable legal precedent, the Court agrees that the Plaintiff need only "show

that he reasonably believed he was entitled to an accommodation under the ADA," and not that such

accommodation was actually legally required.  Jones v. UPS, Inc., 502 F.3d 1176, 1194 (10th Cir.

2007).  The Sixth Circuit has stated that a "plaintiff may prevail on a disability-retaliation claim

'even if the underlying claim of disability fails.'"  Bryson, 498 F.3d at 577 (quoting Soileau v.

Guilford of Me., 105 F.3d 12, 16 (1st Cir. 1997)).  It has further indicated that, unlike a claim for

discrimination, "an ADA retaliation claim based upon an employee having requested an

---

[22]As with other claims that are analyzed using the McDonnell Douglas approach, if the
Plaintiff succeeds in proving a prima facie case, "the burden shifts to the defendant to articulate a
legitimate, non-discriminatory reason for the adverse action.  If the defendant meets this burden,
the plaintiff must then show that the defendant's articulated reason is a pretext for
discrimination."  Nguyen v. City of Cleveland, 229 F.3d 559, 562 (6th Cir. 2000) (citing
McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03, 36 L. Ed. 2d 668, 93 S. Ct. 1817
(1973)).  An employer's legitimate explanation may be shown to be not credible where any of
the following are established: "(1) that the proferred reasons had no basis in fact, (2) that the
proferred reasons did not actually motivate [the adverse employment action], or (3) that they
were insufficient to motivate [the Defendant's actions]."  Manzer v. Diamond Shamrock Chems.
Co., 29 F.3d 1078, 1084 (6th Cir. 1994) (internal quotation marks omitted).

accommodation does not require that a plaintiff show that he or she is 'disabled' within the meaning of the ADA." Id. (quoting Williams v. Philadelphia Housing Auth. Police Dep't, 380 F.3d 751, 759 n.2 (3d Cir. 2004)).   The evidence presented in this case shows that the Plaintiff requested accommodation that would alleviate WRD's safety concerns over his pacemaker.  The mere fact that Baker was ultimately found not to have had a "disability," as defined in 42 U.S.C. § 12102(2)(A) or (B), does not necessarily mean Baker did not have a good faith belief that he had rights under the ADA at the time he requested accommodation.  See, e.g., Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 191 (3d Cir. 2003) (stating that the "ADA protects one who [requests an accommodation in good faith] without regard to whether the complainant is 'disabled'").  Given the proof at trial, the jury could have found that Baker "had a reasonable, good faith belief that [he] was entitled to request the reasonable accommodation [he] requested," which is sufficient to satisfy the first element of the prima facie case.  Williams, 380 F.3d at 759 n.2.

With regard to the "adverse employment action" prong, the Plaintiff argues that because the Defendant conditioned his return to work with an EMF alarm upon Baker waiving his workers' compensation rights, he was forced to choose between two adverse employment actions of either losing benefits or being prohibited from returning to work.[23]  (D.E. 101, Pl.'s Response, at 24.) WRD argues that this could not constitute an adverse employment action for the following reasons: (1) Baker was not fit to return to work; (2) unpaid medical leave cannot be an adverse employment action; and (3) requiring him to forego his workers' compensation rights as a precondition for

_____

[23]The Plaintiff refers to this as a "Hobson's choice," which is a choice where only one true option is provided–i.e. a "take it or leave it" offer.  See Zelman v. Simmons-Harris, 536 U.S. 639, 706, 122 S. Ct. 2460, 153 L. Ed. 2d 604 (2002) (noting that "a Hobson's choice is not a choice") (Souter, J., dissenting).

returning to work was not an adverse employment action.

First, the Court generally agrees that, in order to consider Baker's involuntary medical leave an adverse employment action, the jurors must have determined that he was otherwise capable of returning to work in light of the risks involved with his pacemaker reacting to EMI.  Evidence supporting the Plaintiff's position includes a video deposition in which Dr. Agbetoyin testified:

> In my medical opinion, I felt that [Baker] should be able to – to return to work as long as he was wearing an EMF alarm, which I feel should alarm in the presence of high electromagnetic fields.  In addition . . . we were going to keep monitoring the device and would do . . . follow-up visits to determine if there was any effect or malfunction from his daily activities.

(D.E. 76, Agbetoyin Dep., at 19.)   Dr. Agbetoyin admitted that his knowledge about the effectiveness of an EMF alarm was limited because he was not an electrical engineer.  (Id. at 85.) Although, in response to a question about whether Baker could work in an area of the plant where his EMF alarm went off, Dr. Agbetoyin said:

> We would have to . . . bring him back and re-interrogate the device because we have to see what specific effect, if any, the device has on him.  I mean, people who wear these devices go through those airport check-in things . . . there are precautions but not contraindications.

(Id.)  In addition to Dr. Agbetoyin, Land indicated that the EMI in the Plaintiff's forklift route was minimal in the center of the aisles.  (Exhibit 7, Land Letter.)  A reasonable jury could have considered all this testimony and reached the factual determination that Baker could have safely returned to his former position with the aid of an EMF alarm.  Cf. Sutton, 527 U.S. at 489 (holding that "if a person is taking measures to correct for, or mitigate, a physical or mental impairment, the effects of those measures–both positive and negative–must be taken into account when judging whether that person is 'substantially limited' in a major life activity").  Additionally, there was an evidentiary basis from which a jury could have found that the Defendant actually considered Baker

25

capable of returning to work:  Land testified that he offered Baker the opportunity to return on the condition that he waive his workers' compensation rights, and logic dictates that whether he waived certain legal rights would not have affected his actual ability to perform the essential functions of his job.  (D.E. 97, Trial Transcript, at 103.)  While the Defendant may not have had an affirmative duty to provide reasonable accommodations, <u>Workman</u>, 165 F.3d at 463-64, an adverse employment action may still have occurred if WRD considered Baker capable of working after the corrective measures had been made available, and yet the Defendant refused to allow him to return from medical leave in retaliation for his protected activity.  Neither the testimony of Land nor Dr. Agbetoyin are conclusive, but the jury was free to accept or reject the factual assertions these witnesses made.  Although no expert testified as to EMI in the workplace or its effects on pacemakers, there is no strict requirement that the Plaintiff's ability to return to work be established through expert testimony.  Considering the evidence in a light most favorable to the Plaintiff and affording him all reasonable inferences,[24] the Court finds a sufficient basis upon which a reasonable juror could have found that Baker was fit to return.  <u>K & T Enter.</u>, 97 F.3d at 175-76.

Second, the Defendant ascribes error to this Court's instruction that the jury could consider involuntary medical leave to be an adverse employment action.[25]  In a case involving retaliation in

---

[24]The Defendant presented contrary evidence, such as Land's expressed concerns about Baker being unable to hear or see the alarm while driving a forklift in the noisy facility.  (<u>See</u> Exhibit 7, Land Letter.)  However, this evidence apparently did not persuade the jury that the EMF alarm was not a reasonable accommodation.

[25]This jury instruction provided as follows:
> An adverse employment action against an employee is one that causes a materially adverse change in the terms or conditions of employment because of the employer's actions.  It includes an action which well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.  Such changes must be more

violation of Title VII, the United States Supreme Court held that a plaintiff must present sufficient evidence for a jury to find "that a reasonable employee would have found the challenged action materially adverse." Burlington Northern & Santa Fe Ry. v. White, 548 U.S. 53, 68, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006).  The Sixth Circuit has noted that factors to consider when determining whether an employment action is materially adverse are as follows: "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." Kocsis v. Multi-Care Mgmt., Inc., 97 F.3d 876, 886 (6th Cir. 1996) (quoting Crady v. Liberty Nat'l Bank & Trust Co., 993 F.2d 132, 136 (7th Cir. 1993)) (emphasis added).  The change in employment condition "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." Id.  In this case, Baker's involuntary medical leave meant that he was paid no salary, received no benefits, and had no work responsibilities.  (D.E. 95, Trial Transcript, at 153.)  Ostensibly, the Kocsis factors lead to the conclusion that a reasonable jury could consider the imposition of unpaid medical leave to satisfy the second prong of the prima facie case.  The Defendant contends, however, that ordering a medical leave of absence, in response to safety concerns over the pacemaker, should be considered a reasonable accommodation, rather than an adverse employment action.  (D.E. 89, Def.'s Mot. for JMOL, at 13.)  It quotes from Cehrs v. Northeast Ohio Alzheimer's Research Center, 155 F.3d 775, 783 (6th Cir. 1998), in which the

---

disruptive than a mere inconvenience or an alteration of job responsibilities.  An unpaid medical leave of absence is not necessarily an adverse action under the law.  However, when deciding if an action taken by defendant constituted an adverse employment action, you may, under the proof presented, consider whether the unpaid medical leave was an adverse employment action.

(D.E. 86, Jury Instructions, at 27 (emphasis added).)

Sixth Circuit wrote that "a medical leave of absence can constitute a reasonable accommodation under appropriate circumstances."  In Cehrs, the plaintiff was a nurse inflicted with psoriasis that was generally dormant, though she would occasionally suffer bouts of severe symptoms.  155 F.3d at 777-78.  Due to a "flare up" caused by a staph infection, Cehrs took temporary medical leave and later requested several extensions.  Id. at 778.  When Cehrs's employer declined to rehire her, she brought claims for violations of the ADA and the Family Medical Leave Act.  Id.  The Court ultimately found that no presumption should exist that "uninterrupted attendance is an essential job requirement," and, under some circumstances, allowing an employee to take medical leave can be considered a "reasonable accommodation" under the ADA.  Id. at 783.  The circumstances in Cehrs–particularly the transience of Cehrs's symptoms and the fact that she had requested the leave voluntarily–were key to the holding.   Unlike the plaintiff in Cehrs, Baker did not seek accommodation for a temporarily disabling condition through medical leave.  Instead, he sought to return to work by employing corrective measures to compensate for a permanent artificial pacemaker.   (See D.E. 95, Trial Transcript, at 143 (Baker testifying he will have to use the pacemaker for "[t]he rest of my life").)  The Court recognizes that, under certain conditions, medical leave can be a reasonable accommodation under the ADA.[26]  See Cehrs, 155 F.3d at 783; Adams v. TRW Auto. U.S. LLC, No. 3:03-1240, 2005 WL 1862302, 2005 U.S. Dist. LEXIS 39636, at *72

---

[26]Despite the Defendant's contentions, the Court did, in fact, instruct the jury in this case that it may find unpaid medical leave to be a reasonable accommodation.  (D.E. 86, Jury Instructions, at 22.)  The verdict clearly indicates that the jury rejected this argument.  The Defendant has cited to no authority holding that medical leave, *ipso facto*, establishes reasonable accommodation and could not be an adverse employment action.  See Cehrs, 155 F.3d at 783 (stating that "a medical leave of absence can constitute a reasonable accommodation under appropriate circumstances") (emphasis added).  Because a jury could have reasonably concluded that unpaid medical leave was an adverse employment action, the Court will not disturb this determination.  K & T Enter., 97 F.3d at 175-76.

(M.D. Tenn. July 22, 2005).  Simply because an employment action would be a reasonable accommodation in one employee's case, however, does not preclude a jury from considering that same action as adverse under entirely different circumstances.  See Leeker v. Gill Studios, 21 F. Supp. 2d 1267, 1272 (D. Kan. 1998) (stating that involuntary medical leave "can be seen as an adverse action"); see also Bryson v. Regis Corp., 498 F.3d 561, 577 (6th Cir. 2007) (stating that, in establishing a claim for retaliation, the "prima facie showing a plaintiff must make will vary depending upon the unique facts of each case").  As such, this argument by the Defendant is unavailing.

Third, the Defendant contends in its reply brief that requiring the Plaintiff to forego his workers' compensation rights was not an adverse employment action.  (D.E. 108, Def.'s Reply, at 9.)  The Court, however, finds that it is not unreasonable for a juror to consider the loss of workers' compensation benefits as more disruptive than a mere inconvenience or alteration in job responsibilities.  Kocsis, 97 F.3d at 886.  As Baker testified, he was concerned about the dire situation of suffering a heart-related injury at work without the safety net of insurance or the statutory benefits available to other employees.  (D.E. 95, Trial Transcript, at 148.)  A reasonable jury could find that this loss of benefits–or compelled surrender of a statutory right–to be materially adverse under the circumstances of this case.  Burlington Northern, 548 U.S. at 68.  As such, the Plaintiff presented sufficient evidence to satisfy the second prong of the prima facie case.

Finally, the Defendant argues that a jury could not have reasonably found that, but for the Plaintiff requesting reasonable accommodation, he would not have suffered an adverse employment action.  WRD avers that the delay in the Plaintiff's return to work was caused by the "ambiguous and contradictory" responses from his doctor and the Plaintiff's unresponsiveness to its "attempts

to engage in the interactive process."  (D.E. 89, Def.'s Mot. for JMOL, at 16.)  The Defendant's explanation presents one possible cause of the employment action it took as to the Plaintiff, but the verdict indicates that the jury did not accredit this interpretation of the evidence.  Apparently, the jury ascribed more weight to other evidence, such as the temporal proximity between the Plaintiff's request for accommodation and the adverse employment action taken by the Defendant.  See, e.g., Burrus v. United Tel. Co., 683 F.2d 339, 343 (8th Cir. 1980) (stating that "causal connection may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action") (citing Grant v. Bethlehem Steel Corp., 622 F.2d 43, 46 (2d Cir. 1980); Womack v. Munson, 619 F.2d 1292, 1296 & n.6 (8th Cir. 1980)). The jury also could have made reasonable inferences based on the Defendant's failure to contact the manufacturer of the pacemaker, its failure to procure a qualified expert to render an opinion about alternatives, or the fact that it did not normally require its employees to waive their workers' compensation rights.  (D.E. 95, Trial Transcript, at 64-66.)  The jury might have concluded that Lane's conditioning Baker's return on waiver of his statutory rights indicated that the Defendant subjectively considered Baker physically capable of performing his former duties, but it sought to deprive him of his workers' compensation rights in retaliation for requesting accommodation.  (Id. at 102-04.)  The Court does not find the jurors' ultimate conclusion to be unreasonable in view of the proof and, therefore, will not substitute its judgment for that of the jury.  Black, 104 F.3d at 825. Because the Plaintiff presented sufficient evidence to establish each element of the prima facie case, the verdict on his retaliation claim must be upheld.

IV.   Back Pay Damages

In accordance with the Seventh Amendment, the Court generally should not substitute "its

own estimate of the amount of damages which the plaintiff ought to have recovered, to enter an absolute judgment for any other sum than that assessed by the jury." Kennon v. Gilmer, 131 U.S. 22, 29, 9 S. Ct. 696, 33 L. Ed. 110 (1889); Farber v. Massillon Bd. of Educ., 917 F.2d 1391, 1395 (6th Cir. 1990). Although, the Court may reduce an award of damages in two situations: (1) when the prevailing plaintiff is offered the option of either a new trial or a reduced award in the process known as remittitur; and (2) when a court enters a judgment as a matter of law as to some portion of a jury award because of a legal rule or because there can be no genuine issue as to the correct calculation of damages. Lulaj v. Wackenhut Corp., 512 F.3d 760, 766-67 (6th Cir. 2008); see also EEOC v. Massey Yardley Chrysler Plymouth, Inc., 117 F.3d 1244, 1252-53 (11th Cir. 1997) (correcting a jury's calculation of the back pay).

The Defendant takes issue with the $84,000 amount of Plaintiff's lost wage damages, asserting that the calculation was improperly made from the date of the November 2005 medical release, though the Plaintiff's physician subsequently amended this release. (D.E. 89, Def.'s Mot. for JMOL, at 16.) The Plaintiff, on the other hand, contends that the damages were calculated from the "29 month period . . . from June 2006 (when Larry Land agreed to return Plaintiff to work if he waived his workers [sic] compensation claim) to the September 2008 trial date."[27] (D.E. 101, Pl.'s Resp., at 19-21.)

A review of the transcript reveals that both parties are incorrect as to how the $84,000 figure was reached during trial. Although, the Defendant is partially correct in that the amount of $84,000 as Baker's back pay is not in accord with the proof presented. (D.E. 95, Trial Transcript, at 117-21).

---

[27]This statement is facially incorrect. The period from June 2006 to September 2008 would be 27 months, not 29.

31

The mistake originated at trial when the Plaintiff's attorney provided Land with a handheld calculator and guided him through calculation of Baker's lost wages based upon the pay rates listed in the collective bargaining agreement. (Id. at 117.) The Plaintiff's attorney incorrectly stated that Baker's lost wages should be counted from June 2005, instead of June 2006. (Id. at 117-18 ("I'm handing you a calculator just to see if you can help me figure this. If we were to look, for example, in June of '05, he would be earning in June of '05 . . . Is it eleven ninety-nine per hour from 11/4/05 until 11/5/05?"); see also id. at 121 (referring to the time period "from June of '05 through September of '08").) This misstatement caused Land to calculate Baker's wages for three years and three months, rather than two years and three months, which led to the incorrect award of $84,000 in back pay. Based on the hourly pay rates in the collective bargaining agreement, the amount of back pay for the period between June 2006 and September 2008 should have been $58,756.54.[28] Because it is undisputed that Baker's pay rate was controlled by the collective bargaining agreement and that the back pay should have been awarded as to the period from June 2006 to September 2008, there is no genuine dispute as to the proper method for calculating back pay, which means the Court is permitted to reduce the jury's award to reflect the actual lost wages of the Plaintiff. Lulaj, 512 F.3d at 766-67. As such, the Plaintiff's back pay damages will be reduced from $84,000 to $58,756.54.[29]

---

[28]The hourly pay rate from June 2006 to the end of October 2006 was $12.24; from November 2006 to about October 2007, it was $12.49; from November 2007 to September 2008, it was $12.79. (See Exhibit 9, Agreement, at 24.) The figure of $58,756.54 was reached based on 2,080 work hours in a year: $10,608.00 ($12.24 x 866.67 (working hours in 5 months)) + $25,979.00 ($12.49 x 2080 (working hours in a year)) + $22,169.33 ($12.79 x 1733.33 (working hours in 10 months)).

[29]The difference of $25,243.46 constitutes the Plaintiff's approximate wages for one year of work.

V.    <u>Compensatory Damages</u>

The Defendant argues that the Plaintiff is not entitled to damages for emotional distress because such distress was not caused by any action taken by WRD.  (D.E. 89, Def.'s Mot. for JMOL, at 17.)  The Defendant claims that the Plaintiff's distress regarding his personal finances was caused by his failure to provide the medical information requested by WRD and his failure to find new employment.  (<u>Id.</u>)  The Plaintiff, on the other hand, avers that he has presented sufficient evidence for a jury to determine that the loss of his job caused him emotional distress, which need not be proven by medical testimony.  (D.E. 101, Pl.'s Resp., at 19-21.)

Because a jury could have determined that the Defendant's violation of the ADA led to the Plaintiff's de facto unemployment, it likewise could have found that the emotional distress accompanying unemployment was caused by the Defendant.  <u>See, e.g</u>, <u>Moorer v. Baptist Mem'l Health Care Sys.</u>, 398 F.3d 469, 485 (6th Cir. 2005) (stating that the "plaintiff's own testimony, along with the circumstances of a particular case, can suffice to sustain the plaintiff's burden" in establishing emotional distress damages) (quoting <u>Turic v. Holland Hospitality, Inc.</u>, 85 F.3d 1211, 1215 (6th Cir. 1996)).  The record contains ample evidence, in the form of Baker's testimony as to how the loss of his job affected him personally, to support an award of $29,500 in emotional distress damages.  (<u>See</u> D.E. 95, Trial Transcript, 155-57.)  Also, the Plaintiff testified that he attempted to find other employment, and the jury considered the Plaintiff's duty to mitigate his damages by making reasonable efforts to obtain new employment.  (D.E. 86, Jury Instructions, at 44; D.E. 95, Trial Transcript, at 154-55.)  In review of the proof, the Court does not find the amount awarded by the jury to "manifest[] plain injustice, or [be] so grossly excessive as to be clearly erroneous."  <u>Turic</u>, 85 F.3d at 1215.  Thus, the Court finds an evidentiary basis to support emotional distress damages.

Finally, throughout the trial, as well as in a footnote in its brief, the Defendant argued that only equitable remedies are available for an ADA retaliation claim.  (D.E. 89, Def.'s Mot. for JMOL, at 14 n.6).  If the Defendant is correct, that would mean that the jury's award of $29,500 was improper because the Court has ruled in favor of the Defendant on the discrimination claim, and only the retaliation claim remains.  See supra at sections II and III.  It may also mean that the Plaintiff would not have had a Seventh Amendment right to demand a jury trial for this cause of action.  See U.S. Const. amend. VII (providing that "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved) (emphasis added); see also Tull v. United States, 481 U.S. 412, 417-18, 107 S. Ct. 1831, 95 L. Ed. 2d 365 (1987) (stating that the Seventh Amendment right to a jury attaches to Congressionally created causes of action that "are analogous to 'Suits at common law'" but not "those actions that are analogous to 18th-century cases tried in courts of equity or admiralty").

The circuit and district courts are split as to whether Congress intended for plaintiffs to receive compensatory damages for violations of 42 U.S.C. § 12203(a).  The only federal appellate court to have provided commentary on the issue has been the Seventh Circuit, which held that the ADA anti-retaliation statute only provides equitable remedies.  Kramer v. Banc of Am. Sec., LLC, 355 F.3d 961, 965 (7th Cir. 2004).  Two Fourth Circuit panels, in unpublished per curiam opinions, subsequently adopted the holding of the Seventh Circuit in Kramer without analysis.  Bowles v. Carolina Cargo, Inc., 100 Fed. App'x 889, 890 (4th Cir. 2004) (per curiam); Rhoads v. FDIC, 94 Fed. App'x 187, 188 (4th Cir. 2004) (per curiam).  The Second, Eighth, and Tenth Circuits, however, have affirmed compensatory damage awards for ADA retaliation claims, but these opinions did not directly discuss the issue as to whether such damages were permitted by the statute.

34

Foster v. Time Warner Entm't Co., 250 F.3d 1189, 1196-98 (8th Cir. 2001); Muller v. Costello, 187

F.3d 298, 314 (2d Cir. 1999); E.E.O.C. v. Wal-Mart Stores, Inc., 187 F.3d 1241, 1244-45 (10th Cir.

1999); see also Salitros v. Chrysler Corp., 306 F.3d 562, 575 (8th Cir. 2002) (upholding an award

of punitive damages).  The Sixth Circuit Court of Appeals has yet to rule on this issue, but three

district courts within this circuit have found that compensatory damages are not available for an

ADA retaliation claim.  See EEOC v. Faurecia Exhaust Sys., Inc., __ F. Supp. 2d __, No.

4:08CV00950, 2008 WL 5716110, 2008 U.S. Dist. LEXIS 107995, at *8-9 (N.D. Ohio Sept. 12,

2008); Arredondo v. S2 Yachts, 496 F. Supp. 2d 831, 836-37 (W.D. Mich 2007); and Cantrell v.

Nissan N. Am., Inc., No. 3:03-0082, 2006 WL 724549, 2006 U.S. Dist. LEXIS 45227 (M.D. Tenn.

Mar. 21, 2006).  Other district courts disagree.  Compare Rumler v. Dep't of Corr., 546 F. Supp. 2d

1334, 1343 (M.D. Fla. 2008) (holding that the plaintiff may seek compensatory damages for an

ADA retaliation claim), Lovejoy-Wilson v. NOCO Motor Fuels, Inc., 242 F. Supp. 2d 236, 240-41

(W.D.N.Y. 2003) (same), and Ostrach v. Regents of the Univ. of Cal., 957 F. Supp. 196, 200-01

(E.D. Cal. 1997) (same), with Sabbrese v. Lowe's Home Ctrs., Inc., 320 F. Supp. 2d 311, 331 (W.D.

Pa. 2004) (holding that compensatory damages are not available for an ADA retaliation claim),

Johnson v. Ed Bozarth # 1 Park Meadows Chevrolet, Inc., 297 F. Supp. 2d 1286, 1291 (D. Colo.

2004) (same), and Boe v. AlliedSignal, Inc., 131 F. Supp. 2d 1197, 1202 (D. Kan. 2001) (same).

In the Eastern District of New York, there is even a split within the same district.  Compare

Infantolino v. Joint Indus. Bd. of the Elec. Indus., 582 F. Supp. 2d 351, 362 (E.D.N.Y. 2008)

(holding that only equitable remedies are available), with Edwards v. Brookhaven Sci. Assocs.,

LLC, 390 F. Supp. 2d 225, 236 (E.D.N.Y. 2005) (allowing compensatory damages).

　　　　The Plaintiff did not address this issue in his response, which may be attributed to the fact

that the Defendant's motion for judgment as a matter of law only raised the argument in a footnote. Since the Court has granted the Defendant judgment as a matter of law as to the Plaintiff's discrimination claim, however, this question of statutory construction will have a significant impact on the outcome of this case because of the jury's award of $29,500 in compensatory damages. Due to the complexity of this particular legal issue,[30] the Court will give the parties an opportunity to submit arguments as to whether compensatory damages are an available remedy for a violation of 42 U.S.C. § 12203(a). Thus, the Court's ruling on the issue will be held in abeyance, and the parties will be afforded thirty days from the filing of this order to submit written arguments.

CONCLUSION

For the reasons articulated herein, the Court **GRANTS** the Defendant's motion for judgment as a matter of law as to the Plaintiff's ADA discrimination claim and **DENIES** its motion as to his retaliation claim. The Court reduces the Plaintiff's award of back pay from $84,000 to $58,756.54. With regard to the validity of the $29,500 award for compensatory damages, the Court will hold the issue in abeyance for an additional thirty days to allow further briefing.

IT IS SO ORDERED this 1st day of May, 2009.

s/ J. DANIEL BREEN
UNITED STATES DISTRICT JUDGE

---

[30]One court lamented that the statutory analysis associated with whether compensatory damages are available for ADA retaliation is "as complex and circular as any this court has previously encountered." Ostrach, 957 F. Supp. at 201.