IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

DOUGLAS BAKER,

      Plaintiff,

v.                                                            No. 1:06-cv-01137

WINDSOR REPUBLIC DOORS,

      Defendant.

_____

ORDER DENYING DEFENDANT'S REQUEST FOR ATTORNEYS' FEES; DENYING
DEFENDANT'S MOTION TO AMEND JUDGMENT OR, ALTERNATIVELY, FOR A NEW
TRIAL; DENYING PLAINTIFF'S MOTION TO SUPPLEMENT AWARD FOR
ATTORNEYS' FEES
_____

The Plaintiff, Douglas Baker, filed this civil action against the Defendant, Windsor Republic

Doors ("WRD"), pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101,

*et seq.*; the Tennessee Handicap Act ("THA"), Tenn. Code Ann. §§ 8-50-103, *et seq.*; and the

Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. §§ 4-21-101, *et seq.*  The Plaintiff

alleged that the Defendant discriminated against him on the basis of his disability status and

retaliated against him for exercising his rights under the ADA.  After a four-day jury trial beginning

on September 5, 2008, a jury found the Defendant liable on both the discrimination and retaliation

claims, awarding Baker $84,000 in back pay[1] and $29,500 in compensatory damages.  On September

22, 2008, Defendant timely renewed its motion for judgment as a matter of law pursuant to Rule

_____

[1]The back pay award was later reduced by the Court to $58,756.54.

1

50(b), Federal Rules of Civil Procedure, and alternatively requested a new trial under Fed. R. Civ.

P. 59. (Docket Entry ("D.E.") No. 89.) While this motion was pending, Magistrate Judge Gerald

Cohn granted the Plaintiff's request for attorneys' fees in the amount of $167,782.50. (D.E. 120,

Order.) On May 1, 2009, the Court granted judgment in favor of the Defendant on the

discrimination claim, but not the retaliation claim.[2] (D.E. 121, Order, citation <u>Baker v. Windsor</u>

<u>Republic Doors</u>, 1:06-cv-01137, 2009 WL 1231035, 2009 U.S. Dist. LEXIS 37176 (W.D. Tenn.

May 1, 2009).) On May 15, 2009, the Defendant filed a motion for attorneys' fees and a motion to

alter or amend the judgment or alternatively for a new trial. (D.E. 122, 123.) The Plaintiff has also

filed a motion to supplement his award for attorneys' fees. (D.E. 134.) After considering the

parties' arguments, the Court DENIES the Defendant's motion for attorneys' fees, DENIES the

Defendant's motion to amend the judgement or for a new trial, and DENIES the Plaintiff's motion

to supplement his attorneys' fees.


FACTUAL BACKGROUND

        In its previous order on the Defendant's motion for judgment as a matter of law, this Court

set forth the evidence as developed at trial as follows:

            WRD manufactures hollow steel doors and metal frames. (Docket Entry
        ("D.E.") No. 95-97, Trial Transcript, at 55, 144.) The Plaintiff has worked at WRD's
        manufacturing plant in McKenzie, Tennessee since July 7, 1985. (<u>Id.</u> at 144.) Baker
        most recently held the position of forklift operator, and his primary duties involved
        transporting doors from the assembly line to the paint line on a forklift, while
        traveling through aisles approximately ten to twenty feet wide. (<u>Id.</u> at 144-45, 230.)

_____

        [2]After permitting the parties to present supplemental briefs, this Court also issued an
order that affirmed the compensatory damages award. (D.E. 141, Order, citation <u>Baker v.</u>
<u>Windsor Republic Doors</u>, __ F. Supp. 2d __, 2009 WL 2064584, 2009 U.S. Dist. LEXIS 61031
(W.D. Tenn. 2009).)

A collective bargaining agreement between WRD and the United Steelworkers of America Local Union 8915 governed the terms of Plaintiff's employment. (Id. at 114-15.)

Baker suffered from an enlarged heart that caused dilated cardiomyopathy[3] with symptoms of fatigue and shortness of breath. (Id. at 142.) In September 2005, he took a leave of absence to have a pacemaker and defibrillator installed so as to curtail rhythm irregularities and prevent heart failure. (Id. at 57, 142.) During his leave, he received short-term disability pay for six months, but all pay and benefits ceased after that period. (Id. at 55, 57-58, 113.)

On November 3, 2005, Baker submitted to WRD a medical form, which provided that, beginning January 9, 2006, he could return to work and "resume activities as tolerated." (Id. at 67, 69, 189.) This return-to-work slip listed no restrictions and was supported by a recommendation for work resumption by Dr. Adey Agbetoyin,[4] Baker's cardiologist. (Id. at 188-89.) WRD also received a brochure issued by Medtronic, the medical technology company that manufactured Baker's pacemaker. (Id. at 60.) This brochure, entitled "Electronic Interference and the Work Site," stated in part:

> The majority of work environments will not alter Medtronic implantable device operation[,] [but] some industrial environments or equipment produce high intensity EMI [electromagnetic interference] that may present a potential risk to the implanted device. . . . An evaluation of the work site regarding EMI may be necessary in determining if a patient can resume work. . . . Medtronic Technical Service consultants are available to work with the physician and employer to determine the level of evaluation or testing needed. Some environments can be evaluated through conversations with a Technical Service Consultant and the employer. On occasion, it may be necessary to continue the evaluation by having an environmental consultant perform testing at the worksite[,] [which] should be done by qualified individuals with proper EMI testing equipment . . . . We can provide technical assistance to the

---

[3]Dorland's Medical Dictionary defines "cardiomyopathy" as "a general diagnostic term designating primary noninflammatory disease of the heart muscle, often of obscure or unknown etiology and not the result of ischemic, hypertensive, congenital, valvular, or pericardial disease." The Dictionary defines "dilated cardiomyopathy" as "a syndrome of ventricular dilatation, systolic contractile dysfunction, and, often, congestive heart failure; the course is usually progressive with a poor prognosis. It is believed to be an expression of myocardial damage caused by a variety of factors, such as alcohol, pregnancy, systemic hypertension, or certain infections."

[4]Dr. Agbetoyin had no formal training in engineering or EMI testing. (D.E. 95, Trial Transcript, at 73.)

3

environmental consultant or employer in interpreting test results and answering questions regarding EMI and possible device interactions. (Id. at 60-63; see also Exhibit 1, Medtronic Brochure.) This document laid out EMI thresholds for the pacemaker at 5Gs.[5] (Id. at 139-40.) It also stated that extremely high intensity fields could disrupt the operation of the pacemaker. (Id.)

Larry Land, WRD's director of human services, conducted what he referred to as the "accommodation review process" with regard to Baker. (D.E. 95, Trial Transcript, at 55, 58, 106-07.) Land explained this as a process whereby all employees returning from medical leave had their restrictions evaluated, and WRD then determined whether the restrictions could be accommodated in the workplace. (Id.) After reviewing Baker's return-to-work slip, Land was concerned by some of the language in Medtronic's pacemaker brochure. (Id. at 58, 63-64.) However, neither Land nor any other WRD employee ever called Medtronic's technical service consultants for assistance or had an environmental test conducted by a qualified EMI expert in the workplace. (Id. 64-66.) Land spoke with Jason Lowery, an engineer working at WRD, but he was not qualified to determine whether the EMI at the facility might affect Baker's pacemaker. (Id. at 138-39.) Lowery did, however, compile a list of the voltages of the various electrical devices around the plant. (Id. at 81, 137-38.)

On January 4, 2006, Land sent a letter to Dr. Agbetoyin stating, "Unfortunately we cannot allow Mr. Baker to return to work until we hear from you as to whether or not his return to work would cause him physical harm," and inquired as to whether Baker's condition necessitated restrictions. (Id. at 69-70, 73-75; see also Exhibit 3, Land Letter.) The letter listed potential sources of EMI in the plant, including a paint booth, resistance welders, fluorescent lights, high bay lighting, and microwave ovens, along with their respective voltage measurements. (D.E. 95, Trial Transcript, at 73-75, 81.) Land was concerned that these devices might affect Baker's pacemaker and perhaps cause him injury from "the slightest physical harm to death." (Id. at 72-73.) Land also sent Dr. Agbetoyin literature describing the Meditronic pacemaker, and inquired of the physician as to whether WRD's manufacturing plant might create unique risks for Baker due to the presence of electronic equipment. (Id. at 123.) On March 1, 2006, Land sent another letter to Dr. Agbetoyin, requesting more information about the pacemaker and stating that "[m]ost of the other jobs available [at the plant] require more physical exertion than [Baker's] current job and all other jobs in the location will have some exposure to the electrical sources referenced above." (Id. at 79-82, 189-90; see also Exhibit 4, Land Letter.)

In response to Land's letters, on March 30, 2006, Dr. Agbetoyin replied by recommending that Baker return to work with restrictions, which included avoiding

---

[5]Gauss, abbreviated "G", is a unit of measurement for electromagnetic fields.

"contact with any electrical current or magnetic fields."[6]  (Id. at 89, 219; see also Exhibit 5, Agbetoyin Letter.)  Dr. Agbetoyin also noted that the labor union, of which Baker was a member, had worked out a route where he could operate his forklift in order to avoid dangerous magnetic fields.  (Exhibit 5, Agbetoyin Letter.)  Though not mentioned in his letter to Land, Dr. Agbetoyin later clarified that he thought Baker could also benefit from using an electromagnetic frequency alarm ("EMF alarm"), which is a device that emits an audible warning when one is in proximity to EMI.[7]  (D.E. 95, Trial Transcript, at 84.)  In his video deposition, Dr. Agbetoyin explained by saying:

> In my medical opinion, I felt that [Baker] should be able to – to return to work as long as he was wearing an EMF alarm, which I feel should alarm in the presence of high electromagnetic fields.  In addition . . . we were going to keep monitoring the device and would do . . . follow-up visits to determine if there was any effect or malfunction from his daily activities.

(D.E. 76, Agbetoyin Depo, at 19.)  On April 13, 2006, Land sent Dr. Agbetoyin a third letter that noted Baker's duties involved frequent exposure to EMI and provided a map illustrating Baker's driving route and locations where EMI had been detected in its facility.  (D.E. 95, Trial Transcript, at 84-88; see also Exhibit 6, Land Letter.)  Land requested that Dr. Agbetoyin personally visit its manufacturing site, but received no response from the doctor regarding that invitation.  (Exhibit 6, Land Letter.)

WRD later purchased an EMF alarm and instructed one of its employees to walk through the areas where Baker's job routinely required him to travel.  (D.E. 95, Trial Transcript, at 89-90, 100, 131.)  Additionally, the Plaintiff's labor union attempted to design a route in which Baker could operate the forklift while avoiding magnetic fields, though apparently this "safe route" was never completed.  (Id. at 127, 129-30.)  On June 6, 2006, Land contacted Baker–over the phone and by letter–and told him that he did not consider the EMF alarm a "reasonable accommodation" because he believed Baker would have difficulty hearing or seeing the alarm over the noise pollution in the facility.  (Id. at 95; Exhibit 7, Land Letter.)  However, Land's letter also stated that "[t]he company believe[d] that it [had] found a solution to the issue and the purpose of this letter [was] to set forth the company's action to this point in the process and [Baker's] alternatives in moving forward."  (D.E. 95, Trial Transcript, at 100, 112-13; Exhibit 7, Land Letter.)  The "solution" offered was for Baker to waive his rights to workers' compensation benefits arising from injury caused by heart disease, heart attack, or coronary failure or occlusion.

---

[6]The doctor's letter also stated that Baker should refrain from lifting over 40 or 50 pounds.  (D.E. 95, Trial Transcript, at 129.)

[7]According to Baker, the idea of using an EMF alarm initially came from his union steward.  (D.E. 95, Trial Transcript, at 147.)

(D.E. 95, Trial Transcript, at 96, 98, 101.)  Land indicated that further delay would result if Baker declined to waive his workers' compensation rights because the company would be in "the state of unknown whether or not [returning to work] would cause him physical harm."  (Id. at 102-03.)  Baker did not agree to the workers' compensation waiver because he was worried that, if he suffered a heart-related injury at work, he would have no statutory benefits and no insurance coverage.  (Id. at 148.)

As of the trial, WRD had not given Baker the option of returning to work without waiving his rights under Tennessee's workers' compensation laws.  (Id. at 104.)  Baker has indicated to WRD that he wishes to return to work, with or without the EMF alarm, though he refuses to do so without workers' compensation coverage. (Id. at 152; see also Exhibit 12, Baker Letter.)  Since June 2006, Baker claims he has inquired into about fifty different positions in several surrounding counties but has yet to obtain new employment.  (D.E. 95, Trial Transcript, at 154-55.)  During this period of unemployment, he has sold some personal items and borrowed money from his father, friends, and three different banks in order to avoid foreclosure on his home.  (Id. at 155-56.)  Baker said that his financial situation has forced him to tears on occasion, damaged his relationship with his son and the rest of his family, and made him feel "like a burden and a bum to everybody."  (Id. at 156-57.)

Prior to trial, WRD instructed its employee, Jack Fields, to inspect its plant with a gauss meter.[8]  (Id. at 326.)  Fields recorded sixteen areas where the meter registered greater than 5 Gs.  (Id. at 327.)  At one point, the meter registered 200 Gs at the edge of an aisle where Baker's forklift would routinely pass, and Fields found other exceptionally high readings around the break room and bathroom.  (Id. at 327-29.)

At the conclusion of the trial, the jury returned a verdict finding that the Plaintiff had been regarded as disabled, was a qualified individual, was not provided reasonable accommodation under the ADA or THA, and had suffered retaliation. (D.E. 85, Jury Verdict.)  The jury awarded him $84,000 in back pay and $29,500 in compensatory damages.  (Id.)  The Court entered a judgment against the Defendant in the amount of $113,500, pursuant to the jury's verdict, and ordered WRD to reinstate the Plaintiff with reasonable accommodations.[9]

(D.E. 121, Order, at 2-7 (footnotes in original).)  Because neither party has objected to any aspect

of the above recitation of the proof, the Court will adopt it for the purposes of deciding these

---

[8]A gauss meter, also known as an EMF meter, is an instrument that detects and measures electromagnetic fields.

[9]The court subsequently ordered a stay of the portion of its Judgement reinstating Baker, pending resolution of all post-trial motions and appeals.  (D.E. 116.)

motions.

ANALYSIS

I.      <u>Defendant's Motion for Attorneys' Fees</u>

Statutory authority can provide a recognized exception to the rule that parties should bear the costs of their own attorneys' fees.  42 U.S.C. § 12205 provides: "In any action or administrative proceeding commenced pursuant to [the ADA], the court or agency, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee, including litigation expenses, and costs . . . ."  For ADA claims, as with other civil rights claims, the applicable standard for determining whether a party is prevailing differs depending on whether the plaintiff or defendant is seeking attorneys' fees. A court may award attorneys' fees to a defendant only where "the plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith." <u>Christiansburg Garment Co. v. EEOC</u>, 434 U.S. 412, 421, 98 S. Ct. 694, 54 L. Ed. 2d 648 (1978). The Sixth Circuit has cautioned that "an award of attorney fees against a losing plaintiff in a civil rights action is an extreme sanction, and must be limited to truly egregious cases of misconduct." <u>Tahfs v. Proctor</u>, 316 F.3d 584, 596 (6th Cir. 2003) (quoting <u>Riddle v. Egensperger</u>, 266 F.3d 542, 547 (6th Cir. 2001)).  Additionally, "[i]t is important that a district court resist the understandable temptation to engage in post hoc reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation." <u>Id.</u> (quoting <u>Christiansburg Garment</u>, 434 U.S. at 421-22).  As the United States Supreme Court has noted, "[e]ven when the law or the facts appear questionable or unfavorable at the outset, a party may have an entirely reasonable ground for bringing suit."  <u>Christiansburg Garment</u>, 434 U.S. at 422.

7

In this case, the Court dismissed the Plaintiff's claim for failure to reasonably accommodate his "regarded as" disability.[10]  The Court found that binding Sixth Circuit precedent stood for the proposition that an employer has no duty to provide reasonable accommodation for a perceived disability.  Specifically, in Workman v. Frito-Lay, Inc., 165 F.3d 460, 467 (6th Cir. 1999), the court stated that a finding of "regarded as" disability "would obviate the [defendant's] obligation to reasonably accommodate" the plaintiff.  Because Baker had only asserted a "regarded as" disability, this Court was bound by precedent to dismiss his reasonable accommodation claim.  The Defendant now argues that Baker's reasonable accommodation claim was "frivolous, unreasonable, or without foundation" because it was contrary to binding precedent.  In rebuttal, the Plaintiff contends that, because there is a good-faith and reasonable argument for an extension or modification of existing law, his claim should not be considered frivolous.[11]

_____

[10]Baker argued that WRD regarded him as disabled, which would qualify him for disability status under 42 U.S.C. § 12102(2)(C).  The Supreme Court has noted two instances where this subsection applies: "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities."  Sutton v. United Airlines. Inc., 527 U.S. 471, 489, 119 S. Ct. 2139, 144 L. Ed. 2d 450 (1999).  Both involve scenarios where an employer entertains misperceptions about an employee's condition.  Id.  In the first instance, the employer believes that the employee "has a substantially limiting impairment that he does not have," and, in the second, the employer believes that the employee "has a substantially limiting impairment when, in fact, the impairment is not so limiting."  Id.  In either case, the employer's mistake is often the result of "stereotypic assumptions not truly indicative of . . . individual ability."  Id. (citing 42 U.S.C. § 12101(7)).

[11]In its reply memorandum, the Defendant accuses the Plaintiff's attorneys of violating Rule 3.3(a)(2) of the Tennessee Rules of Professional Conduct, which provides that "[l]egal argument based on a knowingly false representation of law constitutes dishonesty toward the tribunal."  It argues that the Plaintiff's previous assertion that a particular portion of Workman was dictum, as opposed to controlling authority, must have been "knowingly false" considering that the Plaintiff now advocates that Workman should be overruled.  The Defendant's accusation has no merit.  The Plaintiff has not conceded that the portion of Workman at issue is not dictum;

8

As a general proposition, the Court agrees with the Plaintiff that a claim for recovery, though ultimately found contrary to existing precedent, may not be frivolous when a reasonable and good faith argument can be made for a change in the existing law.  See Fed. R. Civ. P. 11(b)(2) (requiring that all parties' "claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law") (emphasis added).  As the Supreme Court has observed, "[t]he law may change or clarify in the midst of litigation."  Christiansburg Garment, 434 U.S. at 422.  Due to this potential mutability, unfavorable precedent does not necessarily mean that the Plaintiff had no reasonable grounds for bringing his claim.  A contrary rule would chill parties from advocating for changes in the law.  Thus, the Court must consider whether the Plaintiff's position–that "regarded as" disabled employees should be entitled to reasonable accommodations–was reasonable and made in good faith in the context of the contemporaneous legal landscape in which it was asserted.

As the Court noted in its previous opinion, the federal circuits disagree as to the issue of whether an employer must reasonably accommodate an employee that it regards as disabled.  Compare Kelly v. Metallics W., Inc., 410 F.3d 670, 675 (10th Cir. 2005) (holding that there is a duty to accommodate), D'Angelo v. Conagra Foods, 422 F.3d 1220, 1235 (11th Cir. 2005) (same), Williams v. Philadelphia Hous. Auth. Police Dep't, 380 F.3d 751, 763, 766 (3d Cir. 2004) (same),

---

he has merely offered an alternative argument that Workman should be overruled if, as this Court has previously found, the statement at issue is controlling authority.  Additionally, the Plaintiff's contention–that the single and unsupported statement in Workman constitutes dictum–was a close question that this Court carefully considered.  (See D.E. 121, Order, at 17-19.)  Simply because this Court was ultimately unconvinced by the Plaintiff's dicta argument, that does not mean it was frivolous, see Christiansburg Garment, 434 U.S. at 421-22, much less "knowingly false."  The Plaintiff has merely presented an alternative argument in response to the Court's ruling, which he is entitled to do.

<u>Katz v. City Metal Co.</u>, 87 F.3d 26, 33 (1st Cir. 1996); <u>with</u> <u>Kaplan v. City of N. Las Vegas</u>, 323 F.3d 1226, 1232 (9th Cir. 2003) (holding there is no duty to accommodate); <u>Weber v. Strippit, Inc.</u>, 186 F.3d 907, 917 (8th Cir. 1999) (same); <u>Newberry v. E. Texas State Univ.</u>, 161 F.3d 276, 280 (5th Cir. 1998) (same).  Given this significant circuit split, the Court is of the opinion that reasonable minds could differ with regard to the legal question at issue.  <u>Cf.</u> <u>DeVoll v. Burdick Painting</u>, 35 F.3d 408, 414 (9th Cir. 1994) (finding that, regardless of whether the parties' arguments were successful, they were not frivolous due to support from "existing out-of-circuit law or good faith arguments to extend, modify, or reverse the law of [the Ninth] Circuit").  Additionally, while the Sixth Circuit's precedent is binding, this Court noted in its previous order that the supporting authority upon which the <u>Workman</u> court based its conclusion was questionable.  To support its point, the <u>Workman</u> opinion cited to 29 C.F.R. § 1630.2(1)-(3).[12]  165 F.3d at 467.  After reviewing this regulation, this Court observed in a footnote:

> The <u>Workman</u> opinion does not analyze or explain the relevance of 29 C.F.R. § 1630.2(1)(1)-(3) to the proposition for which it is cited.  This regulation . . . provides examples of situations in which a plaintiff may be "regarded as" disabled, but it never mentions "reasonable accommodation" either implicitly or explicitly.  Based on a plain reading, it is not apparent how this regulation would support the proposition that reasonable accommodation is not available to an employee who is regarded as disabled.

(D.E. 121, Order, at 17, n.15.)  Since <u>Workman</u> was published, it does not appear that the Sixth Circuit has had the opportunity to reconsider this issue or provide a more thorough explanation for its holding.[13]  <u>See</u> <u>Wilson v. Phoenix Specialty Mfg. Co.</u>, 513 F.3d 378, 388 (4th Cir. 2008)

---

[12]The <u>Workman</u> court also cited to "First Br. of Defendant-Appellant at A-3 (EEOC Training Manual)," but this Court was unable to locate a copy of that source.

[13]The Sixth Circuit has never conducted an explicit analysis of the statutory language. For example, the Tenth Circuit has made the following observations:

(observing that the Workman court reached its conclusion on this issue "without analysis").

Given these considerations regarding the closeness of the legal issue presented and the uncertain basis for the Sixth Circuit's precedent, this Court finds that the Plaintiff raised a reasonable argument that a portion of Workman should be overruled. Because the Defendant has not shown that the Plaintiff's claim was "frivolous, unreasonable, or without foundation," its motion for attorneys' fees is denied.[14] Christiansburg Garment, 434 U.S. at 421.

II.      Defendant's Motion to Amend Judgment or For a New Trial

The Defendant filed a motion pursuant to Rule 59(a) and (e) of the Federal Rules of Civil Procedure requesting the following: (1) to grant the Defendant a new trial on the Plaintiff's retaliation claim; (2) alter or amend the portion of this Court's May 1, 2009 order denying judgment as a matter of law on the Plaintiff's retaliation claim; (3) and alter or amend the Magistrate Judge's

_____

The ADA prohibits discrimination against "a qualified individual with a disability." 42 U.S.C. § 12112. The Act defines "qualified individual" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." Id. § 12111(8). A "disability" is defined as being, among other things, "regarded as having . . . an impairment" that "substantially limits one or more of the major life activities of . . . [an] individual." Id. § 12102(2). Thus, the plain language of the ADA's interlocking statutory definitions includes within the rubric of a "qualified individual with a disability" protected by the ADA individuals (1) regarded as disabled but (2) who, with reasonable accommodation, can perform the essential functions of the position that they hold.

Kelly, 410 F.3d at 675.

[14]Additionally, it is important to note that the jury alternatively found the Defendant liable for retaliation. Because this Court subsequently found that compensatory damages are available in ADA retaliation actions, Baker v. Windsor Republic Doors, __ F. Supp. 2d __, 2009 WL 2064584 (W.D. Tenn. 2009), dismissal of the reasonable accommodation claim had no effect on the amount of the monetary award. Cf. Berger v. City of Mayfield Heights, 265 F.3d 399, 406 (6th Cir. 2001) ("A plaintiff need not prevail on all claims asserted in the complaint to obtain attorneys' fees.").

order partially granting the Plaintiff's motion for attorneys' fees.  The Court will address each argument separately.

A. Motion for a New Trial

Rule 59(a)(1)(A) provides that "[t]he court may, on motion, grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court."  The authority to grant a new trial normally lies within the discretion of the trial court.[15]  Allied Chem. Corp. v. Daiflon, Inc., 449 U.S. 33, 36, 101 S. Ct. 188, 66 L. Ed. 2d 193 (1980).  At this stage in the litigation, however, this Court no longer has jurisdiction to grant a new trial.  On September 9, 2008, the Defendant filed a notice of appeal.  (D.E. 90.)  After a case number was assigned, the Court of Appeals simultaneously held this case "in abeyance until District Court rules on pending motions."[16]  (D.E. 104.)  The motion for new trial presently at issue was filed on May 15, 2009.  (D.E. 122.)  As certain commentators have stated, "[i]f notice of appeal is given, the subsequent filing of a motion for a new trial, even if otherwise

---

[15]A new jury trial should be granted where a "seriously erroneous result" has occurred, such as where "(1) the verdict [was] against the weight of the evidence; (2) the damages [were] excessive; or (3) the trial [was] unfair to the moving party in some fashion, i.e., the proceedings [were] influenced by prejudice or bias."  Holmes v. City of Massillon, 78 F.3d 1041, 1045-46 (6th Cir. 1996).  The party requesting a new trial as the result of improperly admitted evidence must establish harmful error.  Tompkin v. Philip Morris USA, Inc., 362 F.3d 882, 891 (6th Cir. 2004).

[16]In its renewed motion for judgment as a matter of law, the Defendant also requested a new trial under Rule 59(b).  In its briefs, however, the Defendant only argued that the Plaintiff's claims failed as a matter of law, and it neither explained why a new trial would have been appropriate nor referred to the applicable standard for assessing a motion for new trial.  (See D.E. 89, Def.'s Mot. for JMOL; D.E. 108, Def.'s Reply.)  As such, this Court implicitly denied that particular request for relief without analysis.  (See D.E. 121, Order.)  The Defendant has made its present request for a new trial under Rule 59(a), as opposed to a motion to alter or amend a judgment pursuant to Rule 59(e).  (D.E. 122, Def.'s Mot., at 7.)

12

timely, is ineffective because jurisdiction of the case is no longer in the district court."  11 Charles

Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure § 2821, p. 222

(2d ed. 1995) (hereinafter "Wright, Miller, & Kane"); see also Burzynski v. Travers, 111 F.R.D. 15,

16 (E.D.N.Y. 1986) (noting that a motion for new trial, even if timely, falls outside the jurisdiction

of the trial court once notice of appeal is given) (citing Sykes v. United States, 392 F.2d 735, 738

(8th Cir. 1968)).  As such, this Court no longer has jurisdiction to decide the Defendant's motion

for a new trial because of the prior notice of appeal.

> B.     Motion to Alter or Amend Judgment as a Matter of Law

Pursuant to Rule 59(e), a party may file a motion to alter or amend a judgment, so long as

it is made within ten days from entry of the judgment.  Unlike a motion for new trial, the Court

"retain[s] jurisdiction over motions for alteration or amendment of judgment filed after notice of

appeal is given."   11 Wright, Miller, & Kane, § 2821, p. 222 (citing Bowers v. Andrew Weir

Shipping, 817 F. Supp. 4 (S.D.N.Y. 1993)).  Thus, the Court has jurisdiction to consider this portion

of the Defendant's motion.

WRD argues that this Court should alter its May 1, 2009 order, so as to dismiss the Plaintiff's

retaliation claim.  Because the Court has already ruled on this precise issue, (See D.E. 121, Order,

at 22-30.), the Defendant's request amounts to a motion to reconsider.  No Federal Rule actually

permits "motions for reconsideration," but courts have implied the availability of this procedure

from Rule 59(e)'s reference to the a motion to alter or amend a judgment.  As one court has noted,

> The purpose of a motion to alter or amend judgment under Fed. R. Civ. P. 59(e) is
> to have the court reconsider matters properly encompassed in a decision on the
> merits.  This rule gives the district court the power to rectify its own mistakes . . .
> Generally, three situations justify a district court altering or amending its judgment:
> (1) to accommodate an intervening change in controlling law; (2) to account for new
> evidence not available at trial; or (3) to correct a clear error of law or to prevent a

> manifest injustice.  It is not designed to give an unhappy litigant an opportunity to
> relitigate matters already decided, nor is it a substitute for appeal.

Sherwood v. Royal Ins. Co. of Am., 290 F. Supp. 2d 856, 858 (N.D. Ohio 2003) (internal citations

and quotation marks omitted).  Rule 59(e) motions are designed for reconsideration, not initial

consideration.  Johnson v. Henderson, 229 F.Supp.2d 793, 796 (N.D. Ohio 2002).

In this case, the only situation outlined above that may arguably apply is clear error.  In an

attempt to show clear error, the Defendant makes the following argument:

> This Court explicitly recognized [that] "in order to consider Baker's involuntary
> medical leave an adverse employment action, the jurors must have determined that
> he was otherwise capable of returning to work in light of the risks involved with his
> pacemaker reacting to EMI." ([D.E. 121, Order, at] 25.)  The May 1, 2009 decision
> found that a reasonable juror could make this finding based on the Plaintiff's use of
> an EMF alarm.  However, this Court also found that the use of an EMF alarm
> qualified as a reasonable accommodation[17] under the ADA–an accommodation that
> is not legally required.  (Id. at p. 21.)  Accordingly, based on this Court's "regarded
> as" holding, it cannot be disputed that Defendant was not legally required to return

---

[17]Although the Plaintiff argued that the EMF alarm should be considered a reasonable accommodation, he also argued that it was a corrective measure.  As illustrated by the Tenth Circuit in Kelly v. Metallics West, Inc., 410 F.3d 670 (10th Cir. 2005), a corrective measure also can be a reasonable accommodation.  The Kelly court found that an employee who needed extra oxygen was not actually disabled because, when using an oxygen tank as a "corrective measure," she was capable of performing all major life activities.  Id. at 673 n.4.  That court also determined that allowing the employee to utilize this corrective measure at work constituted a "reasonable accommodation."  See id. at 676 ("Reasonable accommodation for a disabled person includes 'acquisition or modification of equipment or devices,' such as the oxygen Kelly requested in this case.").  Applying the reasoning in Kelly to this case, a reasonable juror could have simultaneously determined that Baker was capable of performing the major life activity of working by utilizing an EMF alarm as a corrective measure, and that permitting him to use the EMF alarm at work would have been a "reasonable accommodation." (See D.E. 121, Order, at 25 (citing Sutton v. United Airlines. Inc., 527 U.S. 471, 489, 119 S. Ct. 2139, 144 L. Ed. 2d 450 (1999)); see also D.E. 86, Jury Instructions, at 53 ("'Mitigating' or 'corrective' measures include 'auxiliary aids,' 'devices,' and 'prosthetics.'  The employee has the right to use such mitigating devices and the employee should be considered with regard to such mitigating devices.").)  While the Defendant may not have had an affirmative duty to provide a reasonable accommodation, that does not mean it was permitted to retaliate against the Plaintiff once the corrective measure had been implemented.  (See D.E. 121, Order, at 26.)

> Plaintiff to work in June 2006. . . .  This legal conclusion . . . ends all arguments that
> the workers' compensation waiver constituted an adverse employment action.

(D.E. 122, Def.'s Mot., at 6 (footnote added).)  Apparently, the Defendant asserts that the Plaintiff was not actually capable of returning to work without a "reasonable accommodation," which is not required for a "regarded as" disability under Workman. However, such an argument ignores the fact that the jury found him "regarded as" disabled, as opposed to actually disabled.  A "regarded as" disability, by definition, deals with an employer's incorrect perceptions about an employee's capacity to perform his job.  See supra at fn.10; Sutton, 527 U.S. at 483.  Because "regarded as" disability necessary concerns an employer's mistaken perception of an employee's actual ability to perform his job, the request for "reasonable accommodation" for a perceived disability cannot be interpreted as foreclosing the possibility that the Plaintiff actually was substantially capable of performing his work duties.

Based on the evidence presented, a reasonable juror could have made the following factual determinations: (1) Baker was actually capable of returning to work with corrective measures; (2) Defendant mistakenly considered Baker unfit to return to work due to a perceived disability; (3) Baker requested accommodation for his "regarded as" disability; (4) Defendant formed the intent to retaliate against Baker for exercising what both parties presumed to be his rights under the ADA; and/or (5) Defendant retaliated by conditioning Baker's return on a waiver of statutory workers' compensation rights.

Under applicable law, to establish a prima facie case for retaliation, the Plaintiff had to show the following:  "(1) [he] engaged in a protected activity; (2) [he] suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse employment action."  Bryson v. Regis Corp., 498 F.3d 561, 577 (6th Cir. 2007).  Baker satisfied the first element

because he engaged in a protected activity by invoking his ADA rights through participation in the Defendant's "accommodation review process."  See id. (holding that "an ADA retaliation claim based upon an employee having requested an accommodation does not require that a plaintiff show that he or she is 'disabled' within the meaning of the ADA" ) (quoting Williams v. Philadelphia Housing Auth. Police Dep't, 380 F.3d 751, 759 n.2 (3d Cir. 2004)). He met the second element because, though he was permitted to use his EMF alarm, he was offered a choice between two adverse employment actions–i.e. waive statutory workers' compensation rights or remain unemployed.[18]  Finally, he satisfied the third element because a reasonable juror could have found that the adverse employment action was motivated by his protected activity.  Thus, the Court does not find that it was clearly erroneous in its prior determination that the Plaintiff established a claim for retaliation,[19] and the Defendant's motion to alter or amend the May 1, 2009 is denied.

---

[18]As this Court previously indicated, a reasonable juror could have considered the EMF alarm, like the pacemaker itself, to be a corrective measure.  See Sutton, 527 U.S. at 489 (holding that "if a person is taking measures to correct for, or mitigate, a physical or mental impairment, the effects of those measures–both positive and negative–must be taken into account when judging whether that person is 'substantially limited' in a major life activity").  As stated in this Court's previous order:

> While the Defendant may not have had an affirmative duty to provide reasonable accommodations, Workman, 165 F.3d at 463-64, an adverse employment action may still have occurred if WRD considered Baker capable of working after the corrective measures had been made available, and yet the Defendant refused to allow him to return from medical leave in retaliation for his protected activity.

(D.E. 121, Order, at 126.)  In other words, the jury could have found an adverse employment action where the Defendant, for retaliatory reasons, refused to allow Baker to return work without a waiver of his workers' compensation rights, despite the fact that the EMF alarm's mitigation of his pacemaker's side effects rendered him capable of performing the substantial duties of his job.

[19]The issue of retaliation is wholly separate from the issue of disability discrimination. See Bryson v. Regis Corp., 498 F.3d 561, 577 (6th Cir. 2007) (holding that "plaintiff may prevail on a disability-retaliation claim 'even if the underlying claim of disability fails'") (quoting Soileau v. Guilford of Me., 105 F.3d 12, 16 (1st Cir. 1997)).

C.      Motion to Alter or Amend

Finally, the Defendant requests this Court to alter or amend the magistrate judge's award of attorneys' fees to the Plaintiff.  Under Rule 59(e),[20] however, the Court may not consider a matter that is wholly collateral to the judgment.  One authority has observed that "[t]he type of relief requested in postjudgment motions for attorney's fees and costs, for instance, is considered collateral unless it is specifically addressed in the judgment, and thus these motion generally do not fall under Rule 59(e)."  11 Wright, Miller, & Kane, § 2810.1, p. 121-22 (emphasis added).  Likewise, the Supreme Court has found that "[a] motion for attorney's fees is unlike a motion to alter or amend a judgment.  It does not imply a change in the judgment, but merely seeks what is due because of the judgment.  It is, therefore, not governed by the provisions of Rule 59(e)."  White v. N.H. Dept. of Employment Security, 455 U.S. 445, 452, 102 S. Ct. 1162, 71 L. Ed. 2d 325 (1982) (quoting Knighton v. Watkins, 616 F.2d 795, 797 (5th Cir. 1980)).  Because the Defendant seeks to modify an order that is collateral to the judgment, its motion to alter or amend the Plaintiff's award of attorneys' fees pursuant to Rule 59(e) is improper.

III.    Plaintiff's Motion to Supplement Attorneys' Fees

The Plaintiff requests additional attorneys' fees pursuant to Rule 54 because of the costs incurred responding to the Defendant's post-trial motions.  The Defendant posits that the Plaintiff's motion is untimely pursuant to Rule 54(d), which requires that "[a] claim for attorney's fees . . . must

---

[20]The Defendant never timely objected pursuant to Rule 72(a), which provides that objections to nondispositive matters decided by a magistrate judge's order must be filed within ten days after being served a copy of the decision and "[a] party may not assign as error a defect in the order not timely objected to."  Fed. R. Civ. R. 72(a).  The magistrate judge's order was filed on December 30, 2008.  (D.E. 120, M.J. Order.)  The Defendant's motion to alter or amend the award of attorneys' fees was filed on May 15, 2009.  (D.E. 122.)

17

be . . . filed no later than 14 days after the entry of judgment." Fed. R. Civ. P. 54(d)(2)(A)-(B)(i). Rule 54 defines a "judgment" as "a decree and any order from which an appeal lies." Fed. R. Civ. P. 54(a); see also Fed. R. Civ. P. 58(a) (stating that "[e]very judgment and amended judgment must be set out in a separate document, but a separate document is not required for an order disposing of a motion . . . for judgment under Rule 50(b)") (emphasis added). By this definition, the Court finds that its order on May 1, 2009 granting in part and denying in part the Defendant's motion for judgment as a matter of law constitutes the "judgment" to which the Plaintiff's motion refers.[21] The Plaintiff's motion for attorneys' fees was filed on June 8, 2009, which is more than fourteen days after any entry of judgment. Considering that Baker has provided no explanation for the delay, the Court denies his motion as untimely.

CONCLUSION

For the reasons articulated herein, the Court DENIES both parties' remaining motions in all respects.

IT IS SO ORDERED this 10th day of August, 2009.

s/ J. DANIEL BREEN
UNITED STATES DISTRICT JUDGE

---

[21]This Court issued a ruling regarding damages on July 7, 2009, but the Plaintiff's request for attorneys' fees could not have been in response to this entry because it occurred subsequent to the filing of the Plaintiff's motion.